# THE MAYOR & CITY COUNCIL OF BALTIMORE *vs.*
## BARZILLAI MARRIOTT.

The charter of the city of Baltimore provides, that the corporation "shall have full power and authority to enact and pass all laws and ordinances necessary to preserve the health of the city, and to *prevent and remove nuisances.*" HELD:

That the effect of this provision is to make the city, like individuals and private corporations at common law, responsible for causing or not removing nuisances, to any person who has received *special damage* therefrom.

Where a statute confers power upon a corporation to be exercised for the public good, the exercise of the power is not merely *discretionary*, but *imperative*, and the words "power and authority," in such case, mean *duty* and *obligation*.

The mere *passage* of ordinances providing for the removal of snow and ice from streets, so as to prevent their accumulation from becoming a nuisance, is not a discharge of the obligation imposed by the charter: the city is bound to make vigorous efforts to *enforce* such ordinances, in order to bring itself within the saving of having used *reasonable care and diligence.*

A party suing to recover damages resulting to him from such nuisance, must show that he used reasonable and ordinary care and diligence to avoid the injury.

Where a party sustains an inconvenience or injury which is experienced in common with all citizens, then the source of complaint is a common nuisance, and the remedy must be by indictment.

APPEAL from the Superior Court of Baltimore city.

This was an action on the *case,* brought by the appellee against the appellants, to recover damages for an injury sus-

tained by the plaintiff, in consequence of the negligence of the defendants in not preventing or removing an accumulation of ice on the footway on the north side of Fayette street, in the city of Baltimore, upon which the plaintiff slipped and fell down, and received injury, whereby he became lame and crippled for life. Plea, *non cul.*

*Exception.* The plaintiff offered in evidence the charter of the city of Baltimore, (act of 1796, ch. 68,) and its supple-ments, and various ordinances of the city, providing for the removal of snow and ice from the streets, and giving authority to the water company to lay pipes and introduce water into the city. (See pages 6, 7, 8 of Ord. of 1848.) The plaintiff then proved, that on the evening of the 19th of February 1849, after dark, whilst returning from church, he slipped and fell on a large sheet of slippery ice which completely covered the footway at the corner of Fayette and Calvert streets, and by the fall fractured his knee-cap in such manner as permanently to lame and cripple him for life; that this ice had been formed in very cold weather, by the freezing of water running from certain hydrants attached to lots occupied by various individ-uals on the north side of Fayette street; that the water from these hydrants escaped through gutters in the foot-pavements, and in cold weather became frozen and obstructed the gutters, and then spread over the footway, forming a large quantity of ice, which rendered the passage of the footway dangerous to passers by; that this occurred in spells of cold weather; that at the time, and for several days before the accident, the ground in the city was not covered by snow or ice, but was covered by ice in several places where there was running water, and that the weather had been clear, cold and freezing, from the 12th of February to the date of the accident. He also proved, that for several winters past the accumulation of ice in this particular locality was regarded by the witnesses as a nuisance. One witness says he had complained to the water company about it, but they had not remedied it, and he had lodged complaints at the police office.

The defendants then proved by the officer whose duty it was to supervise the contractors for cleaning streets, and had

21    v.9

general supervision under the ordinances to preserve health and remove nuisances, that he had frequently directed the police to pay attention to this particular locality, and that there was as much attention paid to prevent ice accumulating on the side walk of that street as to any other point in the city, if not more; that, from the peculiar situation of the street, he believes it almost impracticable to prevent the accumulation of ice on the pavement; that unless the city was to employ an immense force, (far greater than she has,) ice will accumulate on the side walks throughout the city; that if the city officers were to watch that particular place only, it might be prevented from accumulating, but that no care could prevent ice forming on the foot-pavements, as it will sometimes form in a single night if the hydrants are allowed to run; that he has no knowledge of the condition of this street at the particular occasion when the accident occurred; it might have been in a dangerous condition, but he has no knowledge of it.  They further proved, that persons living on this street had been frequently notified by the police to clear away the ice on the pavements fronting their premises, and that the ice was occasioned by the leaking of the hydrants, some of which were in a decayed and defective condition, and by their being allowed to run.  They also proved by another witness, who was in company with the plaintiff at the time, that he, the witness, passed the locality a few feet ahead of the plaintiff, when the latter fell, and that the night was cold and star-light, and that the lamp was burning at the corner where the accident occurred.

The plaintiff then offered the prayer which is set out in the opinion of this court.  The defendant then offered the following prayers:

1st. If the jury find from the evidence that the mayor and city council of Baltimore did pass an ordinance, or ordinances, providing against any nuisance arising from the accumulation of ice or other obstructions on the side walks, the corporation is not liable for any injury which the plaintiff may have sustained, (if the jury shall so find,) from injuries arising from their neglect or violation by the owners of property binding on the street, upon the foot pavements of which the injury was sustained by the plaintiff.

2nd. (This prayer is stated in the opinion of this court.)

3rd. If the jury find from the evidence that the plaintiff did not use reasonable and ordinary care and diligence, whereby he might have avoided the injury sustained by him as given in evidence, then the plaintiff is not entitled to recover, even if they should also find that defendants were guilty of a want of ordinary care and diligence in not causing the ice to be removed from the pavement.

The court, (FRICK, J.,) granted the plaintiff's prayer, and also the 2nd and 3rd prayers of the defendants, but rejected their first. To the granting of the plaintiff's, and to the rejection of their first prayer, the defendants excepted. The verdict and judgment were in favor of the plaintiff for $500 damages, and the defendants appealed.

The cause was argued before LE GRAND, C. J., TUCK and MASON, J.

*Grafton L. Dulany* for the appellants, argued: That an action on the case, such as that brought in this cause, will not lie at *common law* against a political or municipal corporation, like that of the city of Baltimore, for the non-feasance or misfeasance of its officers, although injury should result therefrom to other persons; that the proper remedy in such cases is against the individual whose act or negligence has occasioned the mischief. By the charter of the city, (act of 1796, ch. 68,) authority is given to the corporation to cleanse and repair streets, and remove nuisances. The *public* are interested in these privileges and franchises thus granted; they are not granted for *private emolument*. It is a power communicated, for the exercise of which the city authorities, acting for the public good, and not their own, are made the judges. By the 8th section of the act of 1796, ch. 68, the ordinances of the city authorities are made as obligatory upon all persons within the limits of the city, "to every intent and purpose, as the acts of the General Assembly of Maryland." The ordinance No. 35 of 1838, exercises the power to remove nuisances so far as they are occasioned by water from the *hydrants*. The

ordinances No. 27 of 1847, and No. 3 of 1848, show the care with which the city has exercised the power conferred by the charter to prevent and remove *nuisances*. Where then is the negligence of the city? The party injured is not without his remedy, for each one of the owners of these hydrants who permits it to overflow is *responsible under the ordinances*, and for his *neglect* the party injured may *sue him*. The corporation has no fund out of which the damages could be paid; if paid at all they must come out of the *public*, and in such a case *salus populi est suprema lex*. It is more *fit* that the individuals should be responsible who neglect their duty under the ordinances. If the city authorities have the right to *legislate* over the subject of nuisances, their action cannot be *ministerial*, and there is no power to review their action thereon. You might just as well say that the *State* is responsible for every murder or act of violence committed within its limits, because it is the duty of the State to protect the citizens against such *acts*. If the city is responsible at all in such cases, it is responsible in every case for non-feasance or misfeasance, just as a *jury* may think in each case, and if the doctrine of responsibility is to be carried to this extent the consequences would be *monstrous*. For every case of sickness occasioned by an epidemic the city would be responsible, if a *jury* might think the city authorities had not properly exercised the power to preserve the *health* of the city. I admit that the city is responsible, like an individual, in all cases where she acts as the *owner of property*, as in the case of *wharfs*, &c., and the cases cited on the other side are all cases of this character. But those are different cases from the present, where the city is *sovereign* within its limits, having authority to *legislate* over the subject by which the injury was occasioned, and has exercised this sovereign legislative power for the public good. In support of these views, and as exempting the city from responsibility in such an action as this, I refer to 17 *How.*, 161, *City of Providence vs. Clapp;* the *manuscript* opinion of Chief Justice Taney, in the case of *Hughes vs. The Mayor & City Council of Baltimore*, in the Circuit Court of the United States. 1 *Hill*, 545, *Martin vs. Mayor, &c., of Brooklyn.* 7 *Mass.*, 187,

*Riddle vs. Proprietors of Locks & Canals on Merrimack River.* 9 *Do.*, 237, *Mower vs. Inhabitants of Leicester.* 4 *Pick.*, 149, *Jones vs. Inhabitants of Lancaster.* 3 *Greenlf.*, 445, *Haskell vs. Inhabitants of Knox.* 2 *Term Rep.*, 669, *Russell vs. Men of Devon;* and to the case of *Barron vs. The Mayor & City Council of Baltimore,* reported in 7 *Pet.*, 243.

*Vivian Brent* and *Charles E. Phelps* for the appellee, argued:

1st. That the *ancient* doctrine, as laid down in the early text books, that a corporation could not be sued *civiliter* for *torts,* is now entirely exploded, and corporations have been held liable for the acts and omissions of their agents in every form of action sounding in *tort,* and *municipal corporations constitute no exception to this principle.* *Cowp.*, 86, *Mayor of Lynn vs. Turner.* 5 *Bing.*, 91, *Henley vs. Mayor of Lyme,* and the same case in King's Bench, in 3 *Barn. & Adol.*, 77, and, on appeal, in the House of Lords, in 1 *Bing. N. C.*, 222. 12 *Pick.*, 184, *Baker vs. The City of Boston,* and 19 *Do.*, 511. 3 *Hill,* 531, *Bailey vs. The Mayor, &c.,* of *New York,* and the same case in error, 2 *Denio,* 433. 3 *Hill,* 612, *Mayor, &c.,* of *New York vs. Furze.* 1 *Sandf.*, 222, *Delmonico vs. The Mayor, &c., of New York.* 3 *Comst.*, 464, *Rochester White Lead Co. vs. City of Rochester.* 1 *Selden,* 369, *Lloyd vs. The Mayor, &c.,* of *New York.* 3 *Do.*, 493, *City of Buffalo vs. Holloway.* 1 *Duer,* 452, 495, *Davis vs. The Mayor, &c.,* of *New York.* 4 *Ohio Rep.*, 500, *Goodloe vs. Cincinnati.* *Wright,* 417, *Paine vs. Commissioners of Portage County.* 10 *Ohio,* 159, *Rhodes vs. City of Cleveland.* 15 *Do.*, 474, *M'Combs vs. Town Council of Akron.* 1 *Indiana Rep.*, 98, *Ross vs. City of Madison.* 5 *Watts & Serg.*, 545, *Dean vs. New Milford.* 10 *Harris,* 54, *City of Pittsburg vs. Grier.* *Ibid.*, 384, *City of Erie vs. Schwingle.* 9 *Humph.*, 757, *City of Memphis vs. Lasser.* 1 *Sandf.*, 27, *Boyland vs. Mayor, &c.,* of *New York.* *Ibid.*, 465. *Levy vs. Mayor, &c.,* of *New York.*

There is nothing in the character of this defendant, either belonging to it in common with corporations in general, or pe-

culiar to the nature of municipal corporations, whether arising from any supposed *sovereignty* or otherwise, which exempts it *prima facie* from liability to actions *ex delicto* for the negligence, whether of misfeasance or of non-feasance, of itself or its servants. *Sovereignty* cannot be predicated of a *municipal corporation* in that large, general, sense in which it is said to exempt the possessor of it from civil liability, nor indeed in any strict sense whatever. The *State of Maryland* is sovereign, inasmuch as it represents the majesty of the people, embodies their law,—creative power—and is above the reach of law, simply because the *creature* cannot place itself above the *creator*. Sovereignty is the ultimate, absolute, uncontrollable power of government; of making laws and enforcing obedience to them, which, in all societies, must be vested somewhere. By the democratic and republican theory this sovereignty is ascribed to the *people of the State*. The expression of the people's will is their constitution. By that instrument the people resolve their sovereignty into the three grand elements of which it is composed, define with precision their respective limits, and distribute them appropriately among the legislative, the executive, and the judicial departments. Having done this the people have delegated their *whole sovereignty*. Whatever attributes or prerogatives of sovereignty have not been expressly delegated, slumber in abeyance. No reserved prerogatives exist in the people capable of a practical exercise, in the sense in which the people of the several States possess reserved rights in reference to the Federal Government. One great reserved right the people do indeed retain, simply because it is inalienable:—the right of recalling their delegated powers and parcelling out their authority anew.

Much less does any original reserved sovereignty exist in *any portion* of the people, or in any collection of citizens. Nor does any number of citizens, however large, any more than an individual citizen, possess sovereignty of and in themselves. *Sovereignty cannot be apportioned.* It grows spontaneously out of the people at large, in their aggregate capacity, and is expressed by the will of the majority of the *whole people*. Each citizen contributes, whether he wills it or not,

Mayor & C. C. of Balto. *vs.* Marriott.

whether conscious of it or not, his infinitesimal portion of the sovereignty of the State. No citizen, therefore, can detect or distinguish out of the common mass that portion of the common sovereignty that has emanated from himself, or appropriate it, for the purpose of founding upon it any exclusive or peculiar personal prerogative. That would be to unravel the web of society and resolve it into its original elements. "If one man has this right every man has, and therefore no man." If no individual citizen can set up such a claim, how can any aggregation of citizens (not claiming to represent the whole people) set it up with any better show of reason? How large a number is requisite? If the inhabitants of a *county*, for instance, may set up this claim, why not the inhabitants of an *election district*? why not those of a *village*? why not the members of a *family*? If the citizens of Baltimore do possess, and may avail themselves of, original sovereignty, why not as well the citizens of a particular *ward*?

But it is said the inhabitants of *Baltimore city* are incorporated for political purposes, and have conferred upon them, by their charter, legislative powers. Here, it is to be observed, the ground changes entirely. The argument shifts. The city descends from the lofty ground of *original sovereignty*, representing the apportioned majesty of a *portion* of the people, and contents itself with referring us to the expressed will of the State Legislature, to which we are all alike subject. It is essential to keep this distinction constantly in view. The whole alleged obscurity which surrounds this subject arises from confounding the supposed rights and immunities inherent in the collective inhabitants of the city, regarded as an *aggregation* of *natural persons*, with the franchises granted to the *corporation* as an *artificial person*, the creature of the Legislature, existing only in "intendment and consideration of the law." In this view the defendant upon this record, to wit, the corporation called "The Mayor & City Council of Baltimore," is just as distinct from the *collective inhabitants* of the city of Baltimore, as from the collective inhabitants of any other city in the United States. (*Bligh vs. Brent*, 2 *Younge & Coll.*, 268.) "If the whole body of members existing at

any given time be collected together within our view, we do not see the corporation, although we see all the existing corporators.'' ( *Grant on Corp.*, 2.)

It is admitted, therefore, that this corporation is the creature of the legislature; that it is just what the legislature makes it and nothing more; that it may exercise just such powers, and enjoy just such immunities, as are expressly conferred upon it, or which result from necessary intendment and implication, and no more. Then the question arises, has this corporation been clothed with any of the attributes of sovereignty, in the sense claimed, of an immunity and exemption from civil liability, for its tortious acts of misfeasance or of non-feasance: 1st, by express terms? or 2nd, by necessary implication?

No clause in the charter or its supplements has been referred to, in which it is pretended that this delegated sovereignty has been expressly or in terms conferred. On the contrary the original charter of 1796, ch. 68, declares precisely to the opposite effect, when in the 2nd section it enacts, that this defendant, ''by *their corporate name, may sue and be sued*, &c., and do all *other acts* as *natural persons.*'' But the defendant denies our right to call it to account for a neglect of its duty, on the ground that the legislature has given it ''power and authority to *enact and pass all laws and ordinances* necessary'' for the furtherance of the objects, and the performance of the duties, for which it was created. Legislation, it is contended, is a function and an attribute of sovereignty; whenever, therefore, the power of legislation is granted, there is granted along with it an exemption from civil liability.

This argument proves too much. The power to pass *by-laws* or *ordinances* is frequently conferred by the legislature upon corporations, both public and private. And the by-laws of railroad corporations, a bank, or a college, are just as binding upon the individual corporations, and all others who subject themselves to their operation, within the scope of their respective charters, and for the legitimate objects of their creation, as are the by-laws or ordinances of the corporation of the city of Baltimore upon its citizens, who are the corporators, and upon all others who come within the sphere of

their influence. If this defendant, therefore, as respects its legislative powers, is sovereign, it follows that bank and railroad corporations, &c., are also sovereign as respects their legislative powers; that it is a mistake to suppose there is any peculiar significance in this grant of legislative power, as it is nothing more than the corporation would have had independent of any express grant, and by the general rule of law, applicable to all corporations. The power to make by-laws is incident to all corporations by the *common law*, as is also the power to enforce them by fines and penalties. (2 *Kent's Com.*, 296.) The object of the legislature in this case, as well as in other similar cases, was to create a corporation with certain *defined* and *limited* powers, and it proceeds to specify, with distinctness, those subjects which are to come within the scope of its authority for the purpose of *excluding all others.*

But it is said there is a distinction between a *private corporation* and a corporation created for *public, political and municipal* purposes. This is simply begging the question and losing sight of the well recognized distinction before adverted to, between the *inhabitants* of the city, as an aggregation of *natural persons,* and the *technical, artificial person,* the creature of the legislature, which is the defendant on this record. The whole fallacy lies in the assumption, that the by-laws or ordinances of the corporation of Baltimore city have the force or dignity of *law* in any higher or more significant sense than the by-laws or ordinances of any other creature of the legislature. And this assumption is the offspring of the vague and loose ideas attached to the word *"law." Law* is the emanation of the supreme sovereign power of the *State.* By that law this corporation was called into existence, and the use of the expression, *"law,"* in connection with the enactments of this corporation, is to be taken in the same restricted and subordinate sense in which it is applied to the enactments of any other corporation which is equally a creation of that law. The mere *power to legislate,* therefore, within certain limits and for certain specified objects, whether of a public or private nature, does not, of itself, raise a corporation above the reach of remedial justice.

22    v.9

There yet remains one ground only upon which the non-liability of the defendant may be urged, and that is, that with reference to the particular duty to *repair its streets and abate nuisances* the city has vested in it the largest discretionary powers, of the exercise of which it is the sole judge, and for the neglect to exercise which it cannot be called to account. In using this argument the defendant lays aside the stilts of sovereignty finally and forever. *Discretionary powers* are an entirely distinct matter from *sovereign prerogatives*, and may be predicated of corporations, whether public or private, or even of natural persons in certain official capacities. The argument, therefore, at this stage, opens to us the admission, that if we can show from a consideration of the various charters which have been passed upon this subject, that the intention of the legislature was to impose upon this defendant a *ministerial duty*, and not merely to confer *discretionary powers*, that then the defendant may be liable for a neglect of such duty. This question we will consider hereafter.

2nd. Where a duty is imposed by law, such as the duty to repair highways, and as included therein, the duty to clear the highway of nuisance, the party upon whom such obligation lies, whether an individual or corporation, is liable to indictment for a neglect of such duty, or to a special action on the case, at the suit of an individual who sustains special damage by such neglect.  See the cases above cited in *Cowp.*, 86; 5 *Bing.*, 91; 3 *Hill*, 612; 5 *Watts & Serg.*, 545; 10 *Harris*, 54; *Ibid.*, 384, and also 7 *Mass.*, 169, *Riddle vs. The Proprietors of Lisbon Bridge.* 2 *Shepley*, 203, *Watson vs. The Proprietors, &c.* 11 *Wend.*, 539, *The People vs. The Corporation of Albany*.

3rd. Within the principles laid down it was the *duty* of the defendant to prevent or remove nuisances and obstructions, and to keep the streets and footways and necessary drains in repair. 1st. There must be a liability to repair existing *somewhere*. The common law of England placed that liability upon the inhabitants of the *Parish*, and for a neglect they were punishable by indictment.  A similar application of the principle in this country would make it, even in the absence of statutes,

the duty of city and county corporations to repair the high-ways or streets within their respective limits, they being the only bodies that have the requisite power and funds. 2nd. But we are not left to reason from general principles. We do not place the liability of the defendant upon the common law, but upon the various statutes and charters which have imposed it in express terms. By the act of 1782, ch. 17, entitled, "An act for the more effectual paving the streets of Baltimore Town," provision is made for the election of "special com-missioners," and they are made a body corporate. Special taxes are designated and appropriated "towards paving, cleans-ing and keeping in repair the streets, lanes and alleys, within the said Town." The fund arising from these taxes is placed under the special commissioners together with a further fund arising from fines and forfeitures, and it is called a "permanent fund to keep in repair the streets." They are invested with general powers to pave and keep clear the streets, "and to agree on, execute and perform, every other act, matter or thing which to them shall appear necessary for the fulfilment of said act." They are directed to employ "proper and capable per-sons" as scavengers to clean the streets. In case of default of the owners to "pave and repair the footways" in front of their houses, "the said special commissioners *shall make, amend and repair the same* out of the public moneys by this act directed to be raised." The said special commissioners are hereby further authorised and empowered to remove or cause to be removed *all manner of obstructions* to the passage through the said streets, lanes and alleys, which they shall find remaining in the same an unnecessary length of time. By the act of 1796, ch. 68, incorporating Baltimore city, the powers of the special commissioners are vested in the corpora-tion of Baltimore city, and provides that the corporation "shall have full power and authority to enact and pass all laws and ordinances necessary to preserve the health of the city *and to prevent and remove nuisances.*" Now apply the well known principle, that where a statute confers a *power* upon a corpora-tion, to be exercised for the benefit of the public or of third par-ties, that exercise is not discretionary but imperative. *"Power"*

in such cases means *duty*, and *"authority,"* *obligation*. *Dwarris on Statutes*, 712. 2 *Salk.*, 609, *Rex vs. Barlow*. *Skinner*, 370, *Rex vs. Inhabitants of Derby*. 1 *Vernon*, 152, *Blackwell's Case*. 11 *Wend.*, 539, *The People vs. Albany*. 3 *Hill*, 612, *Furze vs. New York*. 9 *How.*, 248, *Mason vs. Fearson*. Besides, the imposition of the *duty* is accompanied by the grant of a special *fund* to be appropriated to the purpose, and this is, of itself, sufficient to charge the corporation. 5 *Bing.*, 108. 10 *Harris*, 64, 65. The power to repair streets and remove obstructions therefrom, resolves itself, therefore, into a plain, direct and executive duty, not to be discharged by legislation merely, not to be satisfied by the passing of ordinances and the appointment of agents, but requiring *ministerial* action. 3 *Hill*, 618. 10 *Harris*, 65. The plaintiff does not seek to charge the defendant with an omission to carry into effect its own ordinances, but with a neglect to perform the duties enjoined upon it by its charter. Nor can the defendant, on the other hand, screen itself from liability behind its own ordinances, which it passed for its own indemnity. The corporation cannot, by legislation, shift off upon third parties, an obligation imposed upon and accepted by itself. The ordinances in question were read to the jury, not as prescribing a rule binding on the city, but as evidence of what was reasonably necessary to be done by the city, in order to the proper performance of its charter duties, in the matter of repairing streets and drains, and removing nuisances, and thus to determine whether due diligence required the defendant to remove the ice from the pavement, or prevent its accumulation. 17 *How.*, 161, *City of Providence vs. Clapp*. 10 *Harris*, 65.

4th. The ice on the pavement, in this case, was a *nuisance* and an *obstruction*, within the meaning of the charter, which the defendant was bound to remove, or a *defect* in the footway or drains which the defendant was, in like manner, bound to *repair*, as is evidenced by its own ordinances. Independent, however, of the definition given by the city, of its liabilities in this respect, by its own ordinances, the ice on the pavement was a *nuisance* and an obstruction equivalent to a want of repair. 1 *Hawk. P. C.*, 212. *Jacob's Law Dic.*, *"Nui-*

*sance."* *Bac. Abr.,* *"Highways,"* *D.* 3 *Bl. Com.,* 216. 4 *Do.,* 167. 3 *Pick.,* 268, *Bigelow vs. Inhabitants of Weston.* 13 *Metcalf,* 292, *Drake vs. City of Lowell.* 7 *Greenlf. Rep.,* 442, *Springer vs. Inhabitants of Bowdoinham.* 2 *Fairfield,* 271, *Frost vs. Inhabitants of Portland.*

5th. There was evidence from which the jury were authorized to infer reasonable notice to the defendant, and want of due diligence in removing the obstructions. 7 *Greenl.,* 445. 13 *Pick.,* 98, *Reed vs. Inhabitants of Northfield.*

6th. But there is another aspect under which the defendant's liability arises, independently of its charter duties. The obstruction in this case was not an inevitable result of the ordinary operation of the elements, over which the defendant could not reasonably be presumed to have control. It was the natural and necessary consequence of the authority given by the defendant to the Water company to lay its pipes and introduce its water within the limits of the city. The powers aud rights vested by statute in the defendant, over the streets, &c., within its jurisdiction, are analogous to those of proprietors of fixed property in general. Its liabilities, therefore, are the same so far as to bring it within the principle, *"Sic utere tuo ut alienum non lœdas."* 1 *Adol. & Ellis,* 822, *King vs. Pedley.* 7 *Mees. & Wels.,* 456, *Thompson vs. Gibson.* 2 *Denio,* 443, *Mayor, &c., of New York, vs. Bailey.* 4 *Do.,* 317, *Fish vs. Dodge.* 9 *Humph.,* 757, *City of Memphis vs. Lasser.*

MASON, J., delivered the opinion of this court.

This action was brought to recover damages for an injury sustained by the plaintiff, in consequence of the alleged negligence of the defendants, in not preventing or removing an accumulation of ice on the footway on Fayette street, Baltimore, upon which the plaintiff slipped and fell, and broke his kneecap, whereby he became lame and crippled for life.

There is no dispute about the facts. That the ice had accumulated and been suffered to remain on the side walk for a long time, to the great inconvenience and even danger of persons passing, and that the plaintiff actually fell and seriously

injured himself, there is no doubt.   But the questions presented upon this record are, first, is a municipal corporation like the city of Baltimore, responsible at common law, as individuals are, for the consequences of causing or not removing nuisances? secondly, if not, has this corporation been made so responsible by any act of our Assembly? and thirdly, if responsible in either aspect of the case, does the evidence disclose that the plaintiff has received such special or particular damage from this nuisance which is not common to all the community, and which will entitle him to maintain the present action?

We will first proceed to consider the second general proposition, viz., the liability of the city under the statutes.

The act of 1796, chap. 68, incorporating the city of Baltimore, among other things, provides, that the corporation "shall have full power and authority to enact and pass all laws and ordinances necessary to preserve the health of the city, *and to prevent and remove nuisances.*"   It is a well settled principle that when a statute confers a power upon a corporation to be exercised for the public good, the exercise of the power is not merely discretionary but imperative, and the words "power and authority," in such case, may be construed *duty and obligation.*

Whether the obligations and liabilities which attach to the individual, in regard to nuisances, apply or not equally to corporations, at common law, it is not now necessary for us to determine.   We are of opinion, that the effect of the provision in the statute just cited, was to place the corporation of Baltimore, in regard to their obligations to prevent and remove nuisances, upon the same footing which is held by individuals and private corporations.   The people of Baltimore in accepting the privileges and advantages conferred by their charter, took them subject to the burthens and restrictions which were made to accompany them under the same charter.   One of those burthens was, the obligation to keep the city *free from nuisances.*   A disregard of the obligation thus imposed would be attended with the same consequences which would result to the individual at common law, were he to disregard his obligations to the community in this particular.   As the duty is

the same in the corporation and the individual, so are the consequences the same for its disregard. The only difference is, that the *common law* imposes the duty upon the individual, while a *statute* of our State imposes it upon the corporation. To say that, under the statute, the city of Baltimore is bound to prevent nuisances, and yet to add that none of the common law consequences attach for not doing so, is to assert what would amount to a contradiction of the first proposition, and virtually affirms that the city is not bound to remove or prevent nuisances. The counsel for the defendants seems rather to admit this position, that the city would be responsible if this obligation was not discharged, but seeks to establish the proposition, that the passage of the ordinances given in evidence, providing for the removal of ice and snow from the streets, operated as a full discharge of the city's obligations, and will constitute a complete defence to all actions like the present. In order that the city should relieve itself from this obligation, it was not only necessary that it should pass ordinances sufficient to meet the exigencies of the case, but it was also bound to see that those ordinances were enforced. To pass an ordinance, and not enforce it, would be the same as if none had been passed, so far as the public interests were concerned. There is no evidence in this record of any effort on the part of the city to enforce their ordinances on this subject, but, on the contrary, it appears they were suffered to sleep as dead letters on its statute books. To have enforced them was necessary to bring the city within the saving, of having used reasonable care and diligence in removing the nuisance complained of. In the case of *Pittsburgh City vs. Grier, 22 Penn. State Rep.,* 65, the court very justly remark, upon a case very similar to the present, that "it is no matter whether that duty (removing a nuisance) remains unperformed because she has no ordinances on the subject, or because, having ordinances, she neglects to enforce them. The responsibilities of the corporation are the same in either case." In the same case, (page 67,) the court further say, "they ought to have performed that duty with vigilant fidelity."

We are not prepared to say that had the city, after it had

passed its ordinances upon this subject, and endeavored to enforce them with vigilance and energy, would not thereby have so far used ordinary care and diligence, as to have exempted them from responsibility upon an action like the present. But this does not appear to have been done, at least there was no proof of it, although the nuisance complained of had existed for a long time before the accident to the plaintiff occurred. And besides, the defendant by modifying its second prayer, which was granted by the court, could have secured all the advantage to which it was entitled upon this point. That prayer was as follows:

"2d. If the jury believe that the accident happened to the plaintiff by reason of the ice being upon the pavement, and that said ice could not have been prevented from being on said pavement, whereby the injury was occasioned, at the time of said accident, but that it was owing to causes which could not have been prevented by ordinary and reasonable care and diligence of the Mayor and City Council, that then the plaintiff is not entitled to recover."

Under it, evidence showing due care and diligence, might have been offered, and the court might, in addition, properly have told the jury, that a vigorous effort to enforce their ordinances on this subject, on the part of the city, would have amounted to such care and diligence, and thus have relieved them from responsibility. Were this not so, there would be no telling how far the city might be made liable for failure to remove nuisances. Great public immorality might be regarded as a nuisance, and every wrong or injury, resulting from such a source, might be laid to the city's account, notwithstanding every effort, through its police, had been made to suppress such immorality and vice. The same might be said of causes producing epidemics and the like.

It was also necessary that the plaintiff should, on his part, show "reasonable and ordinary care and diligence, whereby he might have avoided the injury sustained by him." But the defendants had the full benefit of this legal principle, by having their third prayer (which embraced the proposition) granted.

The only proposition, then, advanced by the defendants, which was denied, was that which affirmed that the mere passage of the ordinances for removing the snow and ice, &c., operated as a discharge of the city from responsibility. For the reasons already assigned, we think the court was right in not adopting this proposition as law.

We think, also, that the plaintiff's prayer was properly granted, as containing the whole law of the case upon the proof legitimately offered. That prayer was as follows:

"If the jury find from the evidence in the case, that ice had accumulated in large quantities on the public footway on the North side of Fayette Street, between St. Paul and Calvert streets, in the city of Baltimore, completely covering the said portion of said footway, in such manner as greatly to obstruct, inconvenience and endanger the public in walking along and over said footway; and if the jury further find, that the said obstruction could have been removed, or the danger and inconvenience therefrom remedied, by the use of proper care and diligence on the part of the defendant, or its proper agents appointed for that purpose; and if the jury further find from the evidence, that the defendant and its proper agents aforesaid, had notice, or might by care and diligence have obtained notice, of such obstruction by ice as aforesaid, a sufficient time to have removed the same before the occurrence of the injury complained of, then it was the duty of the said defendants, or its agents, to have removed the said obstruction in a reasonable time after notice thereof, or after they might have obtained notice thereof, by the use of ordinary care and diligence; and if the jury further find that the plaintiff, while exercising ordinary care and diligence on his part, received the injury complained of by falling on said obstruction by ice, and that such injury occurred after the lapse of a sufficient time from the notice of such obstruction to the defendant, or its said agents, or from the period when the defendant or its agents might have obtained notice thereof, by the exercise of ordinary care and diligence, then the plaintiff is entitled to recover such damages by reason of his injury, as the jury may think he has sustained under the circumstances."

23 · v.9

The only questions remaining, are, was the condition of the street which led to the accident, such as to amount to a nuisance, and if so, has the plaintiff sustained such an injury, special and peculiar, as will entitle him to recover. There can be no doubt from the evidence in the case, and it seems not to be controverted by the defendants, that the condition of the street was a nuisance. It is equally clear too, that the plaintiff has sustained such an injury as will entitle him to maintain this action. Where a party sustains an inconvenience or injury which is experienced in common with all the citizens, then the source of complaint becomes a common nuisance, and the rule of law is clear, that the remedy must be by indictment. But, on the contrary, notwithstanding the party producing the nuisance may be indicted, yet if its existence has produced special and particular damages to an individual, the latter may maintain a special action against the wrongdoer. The law upon this particular point is correctly and fully stated in the case of *Stetson vs. Faxon,* 19 *Pick.* 147; and by Judge Archer, in an opinion delivered in the Baltimore county court, in the case of *Barron & Craig vs. City of Baltimore,* reported in the 2 *American Jurist,* 201, in the year 1828.

The view we have taken of this case does not conflict, in our judgment, with the decision of the Supreme court in the case of *The City of Providence vs. Clapp,* 17 *Howard* 161.

In that case the court say, "it is admitted that the defendants are not liable for the injury complained of at common law, but that the plaintiff must bring the case within the above statute to sustain the action." We have said in this case, that the liability of the defendants is fixed by the statutes of our State, and nothing more.

The general liability of a municipal corporation, like the present, in actions of this kind, has been recognised by a number of well adjudged cases, many of which resemble the case at bar. *City of Erie vs. Schwingle,* 22 *Penn. State Rep.,* 384. *Pittsburgh City vs. Grier, Ibid.,* 54. *Delmonico vs. New York City,* 1 *Sandf.,* 222. 19 *Pick.,* 511. *Henly vs. Mayor of Lyme,* 5 *Bing.,* 91, and others.

*Judgment Affirmed.*