# CHARLESTON

CAVENDER *v.* CITY OF CHARLESTON.

Submitted October 29, 1907.    Decided November 19, 1907.

1. BRIDGES—*Duty of City to Repair.*
    Where by the extension of the corporate limits of a city a public bridge, owned and controlled by a county, comes to be within such city it becomes the duty of the city to keep the bridge in repair. (pp. 658, 660.)

2. MUNICIPAL CORPORATIONS—*Bridges—When Part of Streets.*
    A public bridge over a stream connecting streets of a city is a part of such streets. (p. 658.)

3.  Bridges—*Liability for Defects.*

   The City of Charleston is under the duty to repair that bridge over Elk river connecting Lovell and Charleston streets, called the Suspension Bridge, and is liable for damage to persons and property arising from injury to the same caused by defect or want of repair of the bridge.  (p. 658.)

4.  Municipal Corporations—*Extension of Corporate Limits—Repairs of Bridge.*

   The Legislature has power to enlarge the corporate limits of a city or town and transfer the duty of maintenance and repair of a public bridge within such limits from the county to the town or city.  (p. 659.)

5.  Cities—*Legislative Control.*

   Power of Legislature over municipal corporations discussed. (p. 659.)

6.  Municipal Corporations—*Duties of City.*

   Where a statute confers power upon a municipal corporation to be exercised for the public good, the exercise of the power is not merely discretionary, but imperative, and the words "the council shall have power to," mean duty and obligation.  (p. 660.)

Error to Circuit Court, Kanawha County.

Action by Lillian S. Cavender, by her next friend, against the city of Charleston.  Judgment for defendant, and plaintiff brings error.

*Reversed.  Remanded.*

Watts, Davis & Mathews, for plaintiff in error.

A. S. Alexander, S. B. Avis and W. E. Chilton, for defendant in error.

Brannon, Judge:

Lillian S. Cavender was crossing Elk river upon a wire suspension bridge, and owing to a defective cable the bridge fell, and she received bodily injury and brought an action for damages against the City of Charleston, and upon motion of the city the court struck out the plaintiff's evidence as not warranting a verdict for the plaintiff and the plaintiff has brought the case to this Court.

It is not denied that the bridge was defective.  Nor is it denied that the plaintiff is entitled to have damages for her injury; but the question is whether the county of Kanawha

.is liable or the city of Charleston.    The plaintiff contends that the city is liable.    The defendant contends that it is not liable, but that the county is liable.    We come first to sections 53 and 54 of chapter 43 of the Code, which contain the following provisions:

"Any person who sustains an injury to his person or his property by reason of a public road, or bridge, in a county, or by reason of a public road, bridge, street, sidewalk or alley in an incorporated city, village or town, being out of repair, may recover all damages sustained by him by reason of such injury, in an action on the case in any court of competent jurisdiction, against the county court, city, village or town in which such road, bridge, street, sidewalk or alley may be, except that such ctiy, village or town shall not be subject to such action, unless it is required by its charter to keep the road, bridge, street, sidewalk or alley therein, at the place where such injury is sustained, in repair.    If it is not so required, the action and remedy shall be against the county court."

"Any person who may be injured as aforesaid by reason of a turnpike, road or bridge belonging to any company or person, or to any county in its corporate capacity, being out of repair, may recover all damages sustained by him by reason of such injury, in the manner prescribed in the preceding section, against such company, person or county, or against the lessee for the time being of any such road or bridge."    It seems that under section 53, a city is only liable when by its charter the duty devolves upon it to keep a road, bridge, or street in repair.    Then the material question here is, Did this duty rest upon the City of Charleston in respect to this bridge?    The City of Charleston formerly bounded on the east side of Elk river and did not include Elk river.    Years back an incorporated company, the Elk River Bridge Company, constructed this suspension bridge over Elk river.    It owned land on both sides of the river on which were located the anchors supporting the cables of the bridge.    Later that company sold and conveyed the bridge to the county of Kanawha.    A street of Charleston, as it existed before the extension of its corporate limits, Lovell street, connected with this bridge, led to it.    On the other side of the river the turnpike led to it, the bridge being thus a part of the

turnpike connecting with Lovell street. The bridge was just as much a part of the turnpike as that part of the turnpike upon the soil. Later the town of Elk City was incorporated. and this turnpike approaching the bridge on the west side became a street of Elk City. Thus, this bridge connected Lovell street in Charleston and Charleston street in Elk City. It was part of a continuous highway formed by those streets. Later the corporate limits of the City of Charleston were extended by an act passed in 1895 so as to include Elk river and the town of Elk City, the bridge being thus within the city of Charleston. It was so at the time Lillian S. Cavender received her injury. In 1895 by chapter 58, Acts of 1895, the charter of Charleston was amended. It becomes then of importance, if not of decisive importance, to see whether this charter puts upon the City of Charleston the duty of maintaining this bridge in repair. Its 21st section is of broad scope, giving the city many and ample powers to be exercised for the public benefit. It says: "The council shall have power * * * to open new streets and extend, straighten, widen and repair old streets and alleys, to curb and pave streets, sidewalks and gutters, for public use, and to alter, improve and light the same * * * and shall have control of all avenues for public use in said city, to have the same kept in good order and free from obstructions on or over them; to regulate and determine the width of all streets, sidewalks and public alleys; to order and direct the curbing and paving of all sidewalks and footways for public use in the city, to be done and kept in good order by the owner or occupant of the adjacent property; to control the construction and repair of all houses, bridges and culverts.", These provisions manifest intent to give wide and general powers over streets of the city. These and many other powers are vested by its charter act in the City of Charleston for public benefit, as appears from the very letter of the act and from the very nature of the powers given the city. For no other purpose than to subserve the public welfare are these powers conferred. The city has not the choice to exercise powers vital for the public weal, such as the maintenance of highways, or not as it chooses, but it must exescise such powers as in their nature are essential to the public welfare.

42

Therefore, we say that this act imposes upon the city the duty, the binding duty, to keep its streets in repair.    The nature of the powers conferred by the act demands this duty of the city.   Not only so, but the letter of the statute not merely gives the power, but it says, in commanding language, that the city "shall have control of all avenues for public use in said city."   For what purpose?   The statute says this control is given ."to have the same kept in good order and free from obstruction."   Now, this bridge within the corporate limits, essential to cross a large river, forming a part of connecting streets of the two cities as they once existed, and now practically made one street by the act enlarging the city, and connecting those streets and forming a continuous street,—this bridge is surely, within the letter of the charter, an "avenue for public use in said city," which the city must keep in repair.   This bridge is an avenue, a street connecting one part of the city with another, over a river. It is a part of the streets; for a bridge is just as much a part of a highway as that part of the highway passing over the earth.   Elliot on Streets, section 27, says: "A public bridge is an essential part of a road, and the erection of a bridge is but the laying out of a highway."   "The approach to the bridge and the bridge itself are both parts of the highway."   4 Am. & Eng. Ency. L. 920; *City* v. *Drew*, 45 Amer. R. 5.   Therefore, we hold that this act itself, the charter of the city, does put upon the city the binding duty of maintaining the bridge in safe repair. " Whenever it is provided that a corporation or officer 'may' act in a certain way, or it 'shall be lawful' for them to act in   a certain way, it may be insisted on as a duty for them to   act so, if the matter, as here, is devolved on a public officer, and relates to the public or third persons."   *Mason* v. *Fearson*, 9 Howard p.259; *Ex parte Doyle*, 62 W. Va. 280, (57 S. E. 824); *Mayor, &c. C. of Balto.* v. *Marriott*, 9 Md. 160,   This bridge once belonged to the county before it was taken into the corporate limits, but the Legislature in 1895 gave control of it to the city, and thus deprived the county of control of it.   After this act was passed the county court by resolution renounced all control over the bridge and conceded control to the city.   It is true that the city by its council disavowed liability for the bridge, disavowed control

over it; but it could not do so. Its disavowal of responsibility for the bridge would be a denial of a duty imposed by act of the legislature. The true construction of the act puts upon the city the liability for this bridge within its limits, and relieves the county from liability. The city cannot evade this obligation. It is very well established doctrine that the Legislature may take from a county even its property. It can modify the powers or duties of a county or a municipal corporation. It can impose upon it any duties it pleases. It can amend its charter as it pleases, if the constitution does not prohibit. "Municipal charters are not contracts and may be amended or repealed at the discretion of the Legislature." *Probasco* v. *Moundsville*, 11 W. Va. 501. "Except to the extent limited by constitutional provisions, the legislative control over municipal corporations is absolute and unrestrained. Municipal powers may be abridged, charters may be modified and amended, territorial limits may be changed, or the corporate existence extinguished entirely, at the arbitrary exercise of legislative will, and wholly irrespective of the wishes or consent of those composing the body politic." 20 Am. & Eng. Ency. L. 1218. See *New Orleans* v. *N. O. Waterworks*, 142 U. S. 79. Hence we must say that the Legislature had power to take from the county this bridge and transfer it to the city. But it is not necessary to concern ourselves with the question, where is the dry legal title? Sure it is that possession, control, use of the bridge is given by the act to the city. This is all that counties and cities have, the soil being in the owners, and the town or county having only the use of the soil for easement. *Gibson* v. *City*, 38 W. Va. 179, holds a city liable for a dangerous structure though it did not erect it. The city used the bridge. It painted it and repaired its floor, thus accepting it. It held it out as a city bridge, and thus became liable for its condition. *Wilson* v. *Wheeling*, 19 W. Va. 323, point 12. It is, however, unnecessary to rely upon this as an estoppel because statute law makes the bridge a city bridge for present purpose. This repair is mentioned here to show the use of the bridge by the city, and its acceptance as a public bridge of the city. We need not inquire as to the mere legal title of this bridge. It is sufficient to say that the charter act gives con-

trol of it to the city; puts the bridge in the possession of the city as an avenue for public use, and imposes in express terms the duty of repair. What else does the act mean? The control of this bridge would alone impose the duty of maintenance, but the act says this control is given to enable it "to have the same kept in good order." When once by the act enlarging the corporate limits of Charleston the bridge came into the city we think the general law, without any express words in the charter act, would put the bridge under the control of the city and impose the duty of maintenance. Chapter 47, section 28, of the Code, says that the council of a "city, town or village shall have plenary power and authority therein to lay off, vacate, close, open, alter, curb, pave and keep in good repair, roads, streets, alleys, sidewalks, crosswalks, drains and gutters for the use of the public." This is the general statute applicable to all municipalities. The imparting of the power to do these things, as above stated, imposes the duty to do them. Chapter 43 makes general provision concerning the establishment of roads, bridges and landings, giving county courts numerous powers touching the same; but in section 43 it denies the power of the county courts as to roads and bridges within its limits by saying: "Nothing contained in this act shall be construed to take from the jurisdiction, charge or control of the council, trustees or other authority of any town, village or city, so much of any road, bridge, landing or wharf, as by the laws now in force is under such jurisdiction, charge or control exclusively." Chapter 43, section 3, says that no road precinct shall include any part of an incorporated village, town or city, which by the provisions of its charter keeps its own roads and streets in order. These general statutes surely exclude the power of the county court from control of any road or bridge within the corporate limits of a municipal corporation. These general statutes applicable to towns and cities generally furnish additional argument for the proposition that the bridge was intended by the Legislature by the Act of 1895 to be under the control, the sole and exclusive control, of the City of Charleston. In view of them it would be an anomaly to say that this bridge connecting streets in the city stood isolated and alone, not subject to the control of the city, but under

the control of the county court; to say that the county
authority was full over this bridge notwithstanding the leg-
islature put it within the corporate limits of Charleston and
that liability for its non-repair rests upon the county and
not the city.    According to this theory the city would be lia-
ble for the streets leading upon the bridge, and there its
jurisdiction and duty would end.    Two authorities within the
city limits.    Our statute law upon the subject would cer-
tainly not bear this interpretation.    Here I may quote from
Elliot on Roads and Streets, section 416.    "There is some
conflict in the cases as to whether the erection of a municipal
corporation does of itself oust the jurisdiction of the county
or township officers over existing highways.    Our opinion is
that as soon as a town or city is incorporated, the public
ways, that is, ways belonging to the public and not owned by
private corporations, come within the jurisdiction and con-
trol of the new public corporation, unless the statute expressly
or impliedly continues the authority of the county or town-
ship officers.    It is apparent that the ways must, of necessity,
change character and the servitude be much extended.    This
extension carries with it wider duties, and greater liabilities,
thus requiring an essentially different control and care.    The
authority of county and township officers can not be the same
as that of city and town officers, and their power is conse-
quently not adequate to the duty and the responsibilty which
the change from suburban to urban highway creates.    The
added responsibility and the augmented duty require broader
authority than that requisite for the care and control of rural
roads.    The decisions in New England do not afford much
assistance on this question, for the doctrine which there
prevails is, as we have said, a peculiar one, and different
from that which obtains in most of the states.    Where
there is no statute, the incorporation of a city seems natur-
ally to imply that the highways within its territorial limits
become streets, and, as such, subject to the control of the
municipality.    *    *    *    *    *    It can not be justly inferred
that the legislature meant to vest two distinct and different
governmental subdivisions with control of the same subject,
for it is evident that conflict and confusion must be the con-
sequence of such a holding, and it ought not to be inferred
without strong reason that the legislature intended such a

result. It is indeed, by no means clear that officers chosen by a county can be placed in charge of streets which it is the duty of a town or city to maintain safe and convenient for passage; it is not, at all events, just to do so, and this result ought to be avoided by holding, as in truth sound principle requires that the courts should hold, that the creation of a municipal corporation does, in the absence of clear words to the contrary, imply that it shall have control of the streets within its territorial limits to the exclusion of the county and township officers." I quote also from section 417. " Exclusive control of municipality over streets. Investing 'the inhabitants of a locality with the government thereof' is a change in the political and governmental subdivisions, and the natural and reasonable intendment is, that when a new governmental instrumentality is established, it takes control of the territory and affairs over which it is given authority to the exclusion of other local governmental instrumentalities. It displaces the old, and takes its place as its legal successor, and not as an auxiliary. This is the general rule as to school property and the like; and there is much stronger reason for applying this rule to public ways than to other public property, for a municipal corporation becomes liable for failure to keep the public ways safe upon the theory that it has exclusive control over them and the power to raise money to maintain them in safe condition for travel. In creating a town or city the legislature must be deemed to do so with knowledge of the general principles which apply to such political subdivisions and with the expectation that they shall exercise the usual jurisdiction of such subdivisions exclusively, and not divide it with other public or *quasi*-public corporations. Acts for the incorporation of towns and cities are directed to a particular subject, and are of greater force, so far as that subject and its incidents are concerned, than laws of a wide and general sweep. The object of incorporating a town or city is to invest the inhabitants of the locality with the government of all the matters that are of special municipal concern, and certainly the streets are as much of special and local concern as anything connected with a town or city can well be. It ought, therefore, to be presumed that they pass under the exclusive control of the municipality as soon as it comes into exist-

ence under the law." *Hanley* v. *City*, 37 W. Va. 578, holds: "When a public road is taken into a city, town or village by its charter of incorporation, it becomes the duty of such city, town or village to keep such road in repair, unless it is abandoned as a public road in the manner provided by law. Proof of abandonment devolves on the city, town or village." Therefore, as the charter and other gen eral statutes give the city jurisdiction .exclusive, exclusive c ontrol over this bridge, and thus impose an obligation of repair, section 53 gives the plaintiff right of action against the city. Section 54 touches the liability of a company, person or county, but section 53 also makes the city liable where the duty of repair rests on it.

It was argued that the clause giving the city control "of all avenues" does not include bridges and that a subsequent clause of the Acts of 1895, section 1, giving council power " to control the construction and repair of all houses, bridges and culverts" does mention bridges, and that the inclusion of bridges in this clause excludes it from the clause giving control over public avenues, because it is not mentioned in that clause; but the answer is, first, that the words "all avenues for public use" must be construed, plainly must, to include a bridge; and, second, that the second clause is simply one giving the council power to regulate the construction of bridges, and it is not the office of that clause to impose duty to construct or repair.

In the deed from the Elk River Bridge Company conveying the bridge to the county of Kanawha there is a p rovision binding the county to keep open the bridge as a free bridge, " and to keep and maintain the same in good repair and safe for public travel." Great stress is laid by the city's counsel on this clause. It is said that this makes a contract placing the obligation to repair on the county, and that it is not to be presumed that the Legislature. intended to absolve the county, and that this liability rests on the county under that deed. What might be the rights of the bridge company under that deed we are not discussing, as between the city and the county the Legislature could transfer the duty of repair. That it has done by the Act of 1895. The Legislature had power to impose this obligation upon the city, and it has done so, and that is enough to impose the

liability.·   The city under this power of the Legislature, was bound to exercise the power and duty to take possession of, use and control this bridge for public convenience, and shoulder the responsibility of its repair, and that is enough to fix the liability.

Again it is argued by counsel for the city that no regular conveyance of the bridge has been made by the county to the city.   It is said that it is real estate and can only be conveyed by deed, whereas the resolution of the county court says that "the control and charge of said bridge be and the same are hereby *turned* over to the said city." As above stated, we are not dealing with the legal title to the bridge.   True, the bridge company owned land on both banks of the river and passed the same to the county, and whether the legal title be in the county to that land we need not say.   The title was conferred only for bridge purposes.   The Legislature, acting upon the subject of the control of the bridge, upon the rights and duties of the county, took the control away from the county court and conferred it upon the city.   Therefore, the question is not one of owership of the land or of the bridge, strictly speaking; it is only a question of where the liability for maintenance and repair rests, and we say it rests upon the city because the bridge is within the city and a part of its highways, and because the Legislature has expressly given it possession and control and commanded it to keep the bridge in repair.   Therefore, the want of a deed from county to city is immaterial.   It is enough to say that the Legislature put the bridge under the jurisdiction and control of the city, and that the county court by a resolution stating that the bridge had by the act of the Legislature become a public street of the city, turned over the control and charge of the bridge to the city.

Our conclusion is that the circuit court erred in striking out the evidence of the plaintiff and directing a verdict for the defendant, and therefore we reverse the judgment, set aside the verdict, and remand the case to the circuit court for further proceedings.

*Reversed.   Remanded.*