BEVERLY BROUN *v.* CITY OF CHARLESTON

(No. 8100)

Submitted February 5, 1935. Decided February 12, 1935.

*Robt. H. C. Kay* and *Dale G. Casto,* for relator.
*Charles Ritchie* and *Philip H. Hill,* for respondent.

HATCHER, JUDGE:

This is a proceeding in mandamus to require the city of Charleston to repair a bridge within its corporate limits known as the South Side Bridge.

The parties stipulated as follows: The bridge was built about 1893 by a private corporation and operated as a toll bridge until in 1914. It was then taken over by the county court of Kanawha County under an executory contract, which was consummated in 1916 by a deed of the bridge to the county. At that time, the bridge was wholly within the city limits. No tolls have been charged by the county since the purchase. The county has made the necessary repairs on the bridge (and its approaches) and has paid for its lighting. It is now in need of repairs. The county has exclusive use of a building located upon the land of the northern approach to the bridge. The city ''has exercised no control, supervision, maintenance or police power over said bridge.'' The property owners in the city have not been relieved from the payment of the county road taxes. The city has levied the maximum rate of levy for the present fiscal year and has no funds available under its present budget for the repair of the bridge.

This proceeding is controlled by the principles announced in the parallel case of *Cavender* v. *City of Charleston,* 62 W. Va. 654, 59 S. E. 732. There, it appeared that the city limits had been extended (in 1895) to include a bridge across Elk River. The bridge had been constructed by a private corporation and sold to the county of Kanawha prior to the extension. The city denied any responsibility for the bridge. The city charter at that time provided: ''The council shall have power to * * * repair old streets * * * and shall have control of all avenues for public use in said city * * * to have the same kept in good order.'' The charter did not refer specifically to bridges, but the court held that since the Elk River Bridge connected one part of the city with another,

that bridge was in effect an avenue. The court rejected the idea that the legal title to the bridge (and its approaches) was of any moment on the question of maintenance and control. The court condemned the thought that the city had any choice in the matter, holding flatly that the power conferred on the city by the legislature to repair and keep in order the avenues of the city, was a mandate to do so. The city was declared to be responsible for the bridge. The views of the court are summarized in the sixth point of the syllabus as follows: ''Where a statute confers power upon a municipal corporation to be exercised for the public good, the exercise of the power is not merely discretionary, but imperative and the words 'the council shall have power to' mean duty and obligation.'' The *Cavender* decision was approved in *McMechen* v. *Traction Co.*, 90 W. Va. 24, 29, 30, 110 S. E. 469, and lauded as ''well-considered''. The authorities cited by the city do not have a background of fact and statute like that of the *Cavender* case and take nothing from its binding force.

The *Cavender* case differs from the present one on the point now in controversy only in time, name, locality and the fact that the county owned the Elk River Bridge when the city limits were extended across that river. Here, the county acquired the South Side Bridge after it was included within the city limits. This difference is not material. Title did not bring control to the county. Whatever the duties of the city in relation to the South Side Bridge prior to its purchase by the county (duties not deemed important to this discussion), after purchase the exclusive control rested with the city. The *Cavender* opinion quotes Code 1899, 47-28 and 43-43, both of which statutes were still in force when the bridge was purchased. (The one confers on a city ''plenary power'' over its streets and the other *excepts* from the jurisdiction of county courts, any road or bridge under the exclusive jurisdiction of a city.) The opinion then declares: ''These general statutes surely exclude the power of the county court from control of any road or bridge within the corporate limits of a municipal corporation.''

The legislative grant of power to the city over its streets

and avenues has been constant through its several charter revisions from 1893 to the present time. Later charters have specifically named *bridges* as under city control. See Acts 1907, 3-8; 1909, 2-7; 1915, 1-7; 1929 (Municipal Charters) 4-7. Consequently we are of opinion that the duty of maintaining the bridge rests upon the city. And since that duty is imposed by the legislature, the city is not relieved therefrom either by its own failure of performance or by the county court's assumption thereof. Neither is the city relieved by reason of its failure to claim for its taxpayers immunity from the county road tax. Duty ignored is not duty discharged.

Again, the mere failure of the city to provide funds for the performance of this duty is not sufficient excuse now for denying the writ. Until the city has exhausted its powers of raising revenue, lack of funds is not a meritorious defense.

The writ is accordingly awarded.

*Writ awarded.*