## Wytheville.

## CITY OF RICHMOND V. VIRGINIA RAILWAY AND POWER COMPANY.

June 14, 1917.

Absent, Burks and Sims, JJ.

1. CONSTITUTIONAL LAW—*Obligation of Contracts—Street Railway Franchise.*—An ordinance granting the right to a company and imposing a corresponding duty to operate a street railway on the streets of a city, when accepted by the company, constitutes a binding contract, not subject to repeal, and protected against any impairment by the Constitution of the United States.

2. STREETS AND HIGHWAYS—*Bridges as Extension of Street.*—As a general proposition bridges, constituting extensions of streets, or connecting streets, are to all intents and purposes parts of such streets.

3. STREET RAILWAYS—*Bridges—Right to Operate Upon City Bridge.*—A street railway was authorized by an ordinance to operate on Fourteenth street (among others) to the city limits. In consideration of the privileges granted the street railway agreed to pay the city a percentage of its gross receipts. At the south end of Fourteenth street was a bridge which with its approach at the time of the passage of the ordinance was owned by a public utility company. The bridge while thus owned was popularly known as Fourteenth street, and the company operated its railway over the approach and bridge to the city limits. Under the statutes regulating the power of eminent domain the city condemned this bridge and its approach and built a new bridge across the river.

*Held:* That the city had no right to impose a rental or toll charge upon the street railway for the use of the new bridge, and this notwithstanding that the statute authorizing the construction of bridges by the city contained a provision that the city might require compensation of transportation companies for the use of the bridges, and notwithstanding that the company by its charter was subject to all reasonable restrictions,

limitations or agreement in operating its railway over bridges across the river imposed by the owners of the bridges.

Error to a judgment of the Law and Equity Court of the city of Richmond, in an action of assumpsit. Judgment for the defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*H. R. Pollard,* for the plaintiff in error.

*H. W. Anderson, A. B. Guigon* and *T. Justin Moore,* for the defendant in error.

PRENTIS, J., delivered the opinion of the court.

The single issue involved in this case is whether, as contended by the city of Richmond, it has the right to impose a rental or toll charge upon the Virginia Railway and Power Company for the use of the new Mayo bridge across James river, recently constructed by the city, or whether, as contended by the company, such bridge is an extension of Fourteenth street, upon which the company has already been granted the right, and charged with the resulting duty of operating its cars, under the ordinance of December 23, 1899.

The pertinent facts are: That at the time of the adoption of the ordinance, the bridge, including its approach at the south end of Fourteenth street, was owned by the Mayo Land and Bridge Company. This approach to the bridge, extending from the northern margin of the canal at Dock street to the river, was 1,000 feet in length, and the bridge proper, including that portion of it on Mayo's Island, in the stream, was 1,748 feet in length, all of which was the property of the Bridge Company. This approach to the bridge,

while thus owned, was open to the public and popularly known as Fourteenth street. By subsequent acts of the legislature, the city of Richmond was authorized to construct and maintain bridges over James river, and to condemn the necessary property therefor, whether already devoted to public uses or not. Pursuant thereto and under the statutes regulating the exercise of the power of eminent domain, the city condemned the bridge and its approach, from the northern end at 14th and Dock streets across the river to its south bank at the north end of Hull street, Manchester, now a part of the city of Richmond, sometimes called South Richmond.

The ordinance of December 23, 1899, granted to the predecessor in right and title of the company, permission to operate a street railway within the limits of the city of Richmond, over many of its streets, subject to many conditions and provisions set forth therein. The authority to operate the route on Fourteenth street reads thus:

"(9) Beginning at Fourteenth and Main streets and connecting with the Main street tracks, and a single track southwardly on Fourteenth street to the corporate limits."

Subdivision 4 of clause 2 of that franchise provides, among other things, that "The said company, on all of the paved streets of the city, whenever the tracks are ordered to be changed and on such streets as may hereafter be ordered to be paved, shall pave the space between all rails, including the space between its tracks where there are double tracks, switches or side tracks, and for a distance of two feet on the outside of the outer rails of its tracks, and, on all unpaved streets, shall put in good repair with such material as the city may use on said street, and so maintain the space between all rails, including the space between the tracks where there are double tracks, switches, or side-tracks, and for a distance of two feet on the outside of the outer rails of its tracks, without reference to the con-

dition of the residue of the street, and shall from time to time make all necessary repairs in said space, under specifications, both as to construction and materials, and as to time of commencing and completing the work as may be prescribed by the committee on streets, under the supervision of the city engineer * * * and said company shall also construct and keep in good repair that part of the floors of all bridges or other structures owned, in whole or in part, or maintained by the city, crossed by any of its tracks, and for a distance of two feet on the outside of such outer rails, and also between the tracks where there are double tracks * * *."

It provides also that for the privileges granted the company shall pay to the city, as compensation, for the use of the streets and alleys, a percentage of its gross receipts ranging from 3½% to 10%. To these rental charges for the use and occupancy of the streets, there are added other requirements as to schedules of the cars, limiting the amount of the fares to be charged, and securing extensive and valuable transfer privileges to passengers.

The ordinance is very carefully drawn, the public interests are well safeguarded therein, and the privileges granted thereby are to continue for thirty years from the 1st day of January, 1900, unless voluntarily surrendered by the company, with the consent of the city council, or sooner forfeited.

When this ordinance was accepted by the company, it constituted a binding contract, not subject to repeal, and protected against any impairment by the Constitution of the United States.

It is freely conceded by counsel for the city that as a general proposition bridges, constituting extensions of streets, or connecting streets, are to all intents and purposes parts of such streets, and the authorities leave no doubt on this question. McQuillin on Mun. Corp. (1912),

sec. 1282; *Pickett Co.* v. *Green Co.* 171 Ala. 377, 54 So. 998; *Sandpoint* v. *Doyle,* 14 Idaho 749, 95 Pac. 945, 17 L. R. A. (N. S.) 497; *McDonald* v. *City of Ashland,* 78 Wis. 251, 47 N. W. 434; *Birmingham* v. *Rochester City Ry. Co.,* 137 N. Y. 13, 32 N. E. 995, 18 L. R. A. 764; *Chicago* v. *Powers,* 42 Ill. 169, 89 Am. Dec. 418; *Cavender* v. *City of Charleston,* 62 W. Va. 654, 59 S. E. 732; *City of Goshen* v. *Myers,* 119 Ind. 196, 21 N. E. 657, 4 R. C. L. 195.

It is claimed, however, that inasmuch as at the time the ordinance here involved was adopted, the city did not own the bridge, and that it only became a part of the public street when built and completed by the city in 1914, therefore, the provisions of the ordinance cannot be held to apply thereto.

We cannot accept this construction of the ordinance. It was purposely and wisely so drawn as to meet such changing conditions as might intervene within thirty years; the references to streets and bridges therein contained must be construed to apply to the streets and bridges therein referred to, not only as they existed at the time the ordinance was adopted, but also as such highways might change for thirty years thereafter. The language used with reference to Fourteenth street, in view of the surrounding circumstances, is significant. It will be noted that although Fourteenth street was only owned by the city from Main street southward to Dock street, the ordinance, nevertheless, imposed upon the company the obligation to operate to the city limits, the city limits at that time being 2748 feet south of Dock street, across James river, at the foot of Hull street in Manchester. It was manifestly within the contemplation of both parties to the contract that cars should be operated to the city limits, and in order to perform the contract the company was obliged to pay the bridge company for its use of the bridge.

The case here is precisely as if at the time of the contract a street had stopped short of the then city limits but the company had nevertheless been required to operate to such limits, over a route clearly indicated, and in order to do so had been forced to obtain permission from the private owners of the land from the end of such street to the city limits, and thereafter the city had condemned such private property and extended the street over such route. The company under such circumstances would still be bound to operate its cars over the extended street, under such a contract, and unless authorized by such contract, the city could charge no additional compensation for such use.

It being conceded that such new bridge, including its approach of 1,000 feet between Dock street and the north bank of the James river, together with that portion of it which is constructed on land, on Mayo's Island, as well as that part of it which spans the north and south branches of James river, constitutes a street of the city, and it being rightly claimed by the city that the company is by its contract compelled to operate thereon, it seems to us that it follows inevitably that the city can impose no burden except those which it imposed upon the company by the ordinance of December 23, 1899, which embodies that contract.

It is further argued by counsel for the city that its authority to collect such rental or toll charges is conferred by the statute giving the city of Richmond the authority to maintain and construct bridges across James river by reason of the express provision therein, that, while such bridges shall be free to the public, the city may require compensation of transmission or transportation companies for their use; and, furthermore, that this is emphasized by the fact that the legislative charters granted to the predecessors of the company, some of which were passed before and some passed since this contract was made, in substance provide, that the company in operating its rail-

way over the bridges already, or any other bridges which might thereafter be, constructed to cross James river, shall be subject to all reasonable restrictions, limitations or agreements as may be imposed by the persons or corporations owning or controlling such bridges. We think, however, that this position is clearly unsound, because it may be confidently said that those statutes which were passed before this contract was entered into have been recognized in the contract, and the considerations paid and agreed to be paid by the company are the considerations which the owners of the bridges have agreed to accept for such use; while those statutes passed since the contract was made cannot be so construed as to interfere with or impair such contract. These subsequent statutes may indeed be easily reconciled with the contract under consideration, and should be construed to mean that tolls may be charged transportation or transmission companies for the use of such bridges as are thereafter built by the city, unless the city has already precluded itself from imposing such tolls by contracts entered into before the statutes were passed.

Our conclusion, therefore, accords with the conclusion of the learned judge of the Law and Equity Court of the city of Richmond. He has thus expressed his views upon the question involved:

"Under the terms of the stipulation between the parties the adjudication of this case is made to turn upon the decision of the question of the power and authority of the city to own and manage the new Mayo Bridge as a toll bridge, in so far as the defendant transportation company is concerned, and so to require the company to pay an annual toll or charge for the use of the bridge.

"If this basic question is determined in favor of the city then it has the right to require the defendant company to pay an annual charge for the use of the bridge and to en-

force payment of a reasonable amount for that purpose by appropriate judicial proceedings. If the city is without such authority it cannot recover against the defendant company.

"It is clear that the acquisition of the right of way for the bridge was had under our general condemnation statutes, and that 'the bridge was constructed and opened by the city altogether as a public improvement and solely for public uses, and not in any way as an incidental investment by the city of municipal funds yielding a pecuniary return.' It is a substantial permanent structure and was intended for and is a public highway open and free to the use of citizens and in that respect does not differ from any other public street of the city.

"The south side of the river is now a part of the city of Richmond and Fourteenth street is a continuous public highway from its intersection with Main street to the southern limits of the city.

"I think the bridge is obliged to be taken as a part of a a continuous public street.

"Under our Constitution and statutes a street railroad cannot operate in the streets of a city without having previously obained the consent of the municipal authorities. If in the present case that consent has never been given, then the defendant company has no right to run over the bridge, and can be forced to cease operating its cars at each end of the bridge. The consent of the municipal authorities to the occupancy of the streets by a railroad company for the operation of street cars is given through an ordinance containing the terms and conditions upon which the consent is based—such an ordinance being the franchise under which the railway company operates in the city. A franchise, however, must be accepted by the company before it becomes binding, and when so accepted its provisions have the obligatory force of the terms of a contract

102

between the city and the company. If the right to run over the bridge be not covered by any of the provisions in the various franchises under which the defendant railway company is operating in Richmond, it not only follows that the company has no authority to run its cars over the bridge, but it seems to me it also necessarily follows that the company cannot be compelled to do so which would result in quite an anomalous condition.

"In other words, if the original franchises do not embrace this right and the corresponding duty, then it is beyond the power of either the city or the railroad company to add to either the privileges or the obligations of the company without a new franchise or contract between them. If the use of the bridge, as of any other street, comes within the terms of the franchises granted to the company, then the city cannot lessen the privileges or add to the obligations of the company without its consent. And it seems to me that this is what the city has attempted to do. I do not think the provision in the act incorporating the company in 1900, nor the amendment to the charter of the city in 1908, affect the relations between the city and the defendant company arising out of the various franchise ordinances governing the operation of the company, all of which—relevant to the question here—were in existence at the time those legislative enactments became effective.

"Those statutory provisions do, however, exhibit a careful protection of the interests of the city as a municipal corporation against any possible claim of the railway company that it could cross the public bridge of the city after it was opened as a public highway, without being subject to the obligations and duties imposed upon it under the franchises and to the payment to the city of the compensation agreed upon in the franchises for operating its cars in the public highways of Richmond generally. The railway company cannot contend that the bridge is not a part

of a public street, and that hence the roadway of the bridge is not within the obligations undertaken by it in its franchises.

"If the bridge as a part of the public street is within the franchises of the railway company, the city can compel the company to run its cars over it, and can force it to comply with the provisions of its franchises—such as the agreement on the part of the company to construct, or pay for the construction of, the tracks and necessary accessories, to keep in repair the paved roadway between the tracks and two feet on each side, and to pay to the city the stipulated percentage on its increased revenue.

"Upon consideration of the franchise ordinances, under which the defendant company is operating, of all the evidence, the statutes bearing upon the questions presented, and of the argument of counsel and authorities cited, my conclusion is that the right of the company to continuous operation of its street car system south on Fourteenth street across the bridge and on Hull street is embraced within the terms of its franchise and subject to the obligations undertaken by it therein, and that the city cannot, without the consent of the company, impose upon the company the payment of any compensation, for its crossing of the bridge in the continuous route mentioned, in addition to the obligations and payments agreed to be performed and made by the company in its franchises.

"Judgment may therefore be entered for the defendant."

The judgment is affirmed.

*Affirmed.*