## Staunton

ROANOKE RAILWAY AND ELECTRIC COMPANY v. JOHN BROWN, BY HIS NEXT FRIEND, AND VIRGINIAN RAILWAY COMPANY, AND

THE VIRGINIAN RAILWAY COMPANY v. JOHN BROWN, BY ETC.

September 12, 1930.

Absent, Campbell and Holt, JJ.

260

Woods, Chitwood, Coxe & Rogers and Leonard G. Muse, for the Roanoke Railway and Electric Company

Hall & Buford, for the Virginian Railway Company

A. B. Hunt and T. W. Messick, for the defendant in error.

EPES, J., delivered the opinion of the court.

This was an action brought in the Hustings Court of the city of Roanoke by notice of motion for judgment by John Brown by his next friend (herein referred to as plaintiff) against the Roanoke Railway and Electric Company (herein referred to as the Electric Company) and the Virginian Railway Company (herein referred to sometimes as the Virginian and sometimes as the Railway Company), co-defendants. The plaintiff sues to recover $2,500 damages for personal injuries received by him on May 13, 1928, while crossing a bridge constructed by the Virginian to carry Thirteenth street in the city of Roanoke over its tracks, on which bridge the Electric Company had constructed and was operating a double-track street railway line.

On May 13, 1928, the plaintiff, a negro boy twenty years of age, was crossing this bridge (which runs north and south) on a motorcycle, going south. There was an automobile in front of him going in the same direction, which he attempted to pass on its left side. Just as he reached a point on the bridge opposite this automobile, the east end of one of the short floor boards between the rails of one of the street car tracks, which was loose and the filler block under which was rotten, was tilted or thrown up above the surface of the roadway by the automobile running over the west end of the board. Plaintiff's motorcycle struck this board and he was thrown from it and injured.

The evidence shows conclusively that the injury to the plaintiff was caused by the defective condition of the flooring of this bridge; and there is no suggestion in the record that the plaintiff on his part was guilty of any negligence which contributed to his injury.

It is conceded by both defendants that the plaintiff, without fault on his part, was injured in passing over said bridge; and the major question at issue is: Are either or both of said defendants liable for the defective condition of the bridge? Both in the trial court and here the contest has been chiefly between the two defendants with reference to their respective liabilities, each in effect contending that the other, and not it, is liable to the plaintiff for the injuries received by him.

The verdict of the jury was: "We, the jury, find for the plaintiff against both defendants and assess his damages at $1,000." The court overruled the motions made by each of the defendants to set the verdict aside, and entered a joint judgment thereon in favor of the plaintiff against the defendants. Each defendant filed a petition for a writ of error, and a writ of error has been granted to each of them; but they have been heard and are here considered together.

For a number of years prior to and at the time the Virginian Railway was built, the Roanoke Street Railway Company, to whose franchises the Roanoke Railway and Electric Company has succeeded, had constructed and been operating a single-track street railway line in that portion of Thirteenth street here in question, under a franchise granted to it by an ordinance of the city of Roanoke adopted August 9, 1892.

Sections 1 and 2 of this ordinance designate the streets and bridges in which the Roanoke Street Railway Company was thereby authorized to construct its tracks. So much of said designation as is here material (with the addition by us of the italicized words) reads as follows:

(1) "On Thirteenth street, S. W., from intersection of Patterson avenue to Riverside boulevard to west side of Development Company's bridge," *i. e., across the Development Company's bridge.*

(2) "To Shenandoah avenue, N. W., across the Fifth street bridge," *i. e., the bridge commonly called the Park street bridge.*

(3) "Thence across the bridge at Shenandoah avenue, N. E.," *i. e., the bridge commonly called the Randolph street bridge.*

These three bridges named were the only bridges then traversed by the streets in which the Electric Company was authorized to lay its tracks. The Development Company's bridge was a bridge over Roanoke river which had been constructed by a private land company, and in 1926 was replaced by what is known as the Memorial Bridge, built just a few feet north of the old Development Company bridge. It does not affirmatively appear by whom the Randolph street and the Park street bridges were built, but presumably they were built by the city, and the argument of counsel treats them as having been built by the city.

The provisions of said ordinance of August 9, 1892, relative to the duty of the Electric Company to maintain and repair said streets and bridges, read as follows:

Section 7. "The said company shall replace all streets excavated, opened or torn up by it, in as good condition as they were prior to the beginning of its operations thereon, and shall at all times keep the space between its tracks, and a space of one foot on each side of said tracks, in as good repair as the residue of said streets; and whenever the said streets shall hereafter be improved by the city authorities by the use of any new material or otherwise, the said company shall make a similar improvement and use the same material between its tracks and for a space

of one foot on each side thereof. And that whenever any street of the city, already improved by macadamizing or paving, is torn up by the said Roanoke Railway Company to lay down its tracks, that said macadamizing or paving shall be replaced in as good condition as before being torn up, and the actual value, including cost to the city of delivering it at the point used by the company, of the stone used in macadamizing, or the paving material, shall be ascertained by the board of public works, and said amount paid by said Roanoke Street Railway Company to the city of Roanoke."

Section 11. "The Roanoke Street Railway Company shall pay twenty-five per cent of the cost to the city of keeping the Randolph street bridge and the Park street bridge in repairs."

By ordinance adopted May 28, 1904, the city of Roanoke granted the Tidewater Railway Company, whose name has been changed to the Virginian Railway Company, the right to cross Thirteenth street. The part of this ordinance here material reads as follows:

"The crossing of Thirteenth street, S. W., shall be over the said railway and by a steel bridge of the same width as the said street; * * * said bridge * * * shall be constructed in all respects to the satisfaction of the city engineer of said city; and said bridge shall be maintained by said railway company under the direction of said city engineer."

In pursuance of this ordinance, about 1907, the Virginian Railway Company dug a deep cut across Thirteenth street and built this bridge, which has come to be known as the "Virginian Railway Company Bridge."

When this bridge was built by the Virginian a single-track street railway line was laid thereon to carry the existing line of the Electric Company over it; but the bridge was so constructed as to permit the Electric Company to double-track its line in the future.

By ordinance approved December 15, 1906, which has since remained in effect, it is ordained as follows:

"Each and every company that is now occupying or that may hereafter occupy with a double-track switch or turnout the public highways or any part thereof, within the corporate limits, shall at all times keep the entire space between the rails of each track and between the two tracks and between a switch or turnout and the main track or tracks, and the space of eighteen inches on the outside of the two outside rails, in as good repair as the residue of the highways."

By ordinance adopted November 20, 1925, the Electric Company was authorized to double-track its line on that portion of Thirteenth street here in question, including that portion of the street which traverses said "Virginian Railway Company Bridge."

The material portions of said ordinance of November 20, 1925, are as follows:

"Be it ordained * * * that the Roanoke Railway and Electric Company * * * is hereby permitted to construct * * * a double-track electric railway from the terminus of its present double-track, which is seventy-five feet north of the north abutment of the Virginian Railway Company bridge, on and along Thirteenth street, a distance of approximately 219 feet, to the northeastern approach of the new Thirteenth street concrete viaduct, across Roanoke river, now under construction.

"The Roanoke Railway and Electric Company is permitted to construct, maintain and operate the above specified double-tracks upon the same terms and conditions as provided in the franchise heretofore granted the said company, or its predecessor, the Roanoke Street Railway Company, applicable to the electric railway on Thirteenth street where said improvements are proposed to be made except as changed and modified herein.

"The Roanoke Railway and Electric Company shall pay the entire cost of paving, repaving and maintaining with like material, and shall keep in as good condition as the residue of the street, that portion thereof occupied by such double-tracks between the outer rails thereof, and for a space of eighteen inches outside of each outer rail; the paving, repaving and maintaining of said paving shall be done to the satisfaction and good liking of the city engineer."

In double-tracking its line on this bridge a different type of rail, heavier and higher than that used in the old single-track line, was used; and the Electric Company, in order to accommodate the construction of the flooring of the bridge to the new type of rails, made some alterations in the construction of the floor of the bridge and of the supports for the flooring and for its rails.

After the double-tracking was done by the Electric Company, the construction of the bridge, as altered by the Electric Company, was as below described; and this was the construction existing at the time of the injury to the plaintiff.

On the transverse steel girders of the bridge longitudinal steel I beams, having a top ten inches wide, were placed, which were so located that one of them was under each rail and one midway between the rails of the tracks. On top of the I beams supporting the rails were laid pine board stringers twelve inches wide and from one and three-quarters to two inches thick, upon which the base of the rails (five and one-half inches wide) rested, leaving on each side of the rail a strip of timber approximately three inches wide to which to nail the flooring. The rails of the double-track line were approximately seven inches high; and in order that the rail might not project too much above the surface of the flooring, filler blocks two inches thick and either four or six inches wide were laid parallel to and against the base of the rails to support the flooring. The

ends of the floor boards, which were twelve inches wide and four inches thick, rested on these filler blocks and were nailed through them to said pine stringers with either sixty or eighty penny wire nails, two nails being driven in each end of a floor board. On the I beams between the rails was laid a five by eight timber filler, which failed to fill the space between the I beam and the floor by about one inch, to which filler the floor boards were also nailed with bolt spikes. Between the rails of the tracks the floor boards were approximately fifty-six inches long. Between the outside rails and the edges of the bridge the floor boards were much longer. The testimony introduced by the Virginian is that the pine stringers and filler blocks were a common grade of pine unsuited for this use, while that of the Electric Company is that they were a good grade of long leaf yellow pine and well suited for this use.

Prior to the alterations made by the Electric Company the stringers on the I beams were white oak timbers. The testimony introduced by the Virginian is that these white oak stringers were thirteen inches wide and four inches thick, that the rails of the single-track line were only five inches high, that the ends of the floor boards rested upon these white oak stringers, without any filler block between the stringer and the floor board, and that the ends of the floor boards were nailed to these white oak stringers with bolt spikes eight inches long and one-half inch square, the holding power of which in oak timber is about six times as great as a sixty penny nail driven in pine timber. On the other hand, the testimony introduced by the Electric Company is to the effect that before the alterations made by it said stringers were only three inches thick, that the rails of the single-track line were six inches high, and that there was a two by four pine filler block between the stringer and the flooring of no better grade than those put in by the Electric Company.

There is some evidence tending to show that even prior to the time that the Electric Company double-tracked its line, the flooring of this bridge gave some trouble by reason of boards becoming loose; and that twelve inch flooring was likely to be rocked loose by automobile travel thereover, and that the flooring should have been made of narrower timbers. But early in 1928 the flooring of this bridge began to give much trouble by reason of the nails holding the floor boards pulling out of the filler blocks and stringers and floor boards becoming loose. Some of the long boards between the outer rails and the edges of the bridge became loosened, but the major trouble was with the short boards between the rails and tracks.

On January 25, 1928, the city manager of Roanoke wrote the chief engineer of the Virginian as follows:

"The city is getting numerous complaints about the condition of the flooring on bridge over the Virginian Railway tracks at Thirteenth street.

"The boards work loose and the nails stick up above the floor and damage automobile tires. It seems to me that the Virginian Railway Company should provide a better floor than the type they are using on this bridge.

"The city has found that the only satisfactory wood flooring for bridges is two by four's sized, laid edgewise, toe nailed and then covered with a light coat of asphalt. This wears better and is the cheapest flooring we have found.

"I wish you would consider reflooring this bridge with this type of construction. Something will have to be done to maintain this bridge in better shape than it has been kept."

Between the date of this letter and May 13, 1928, the city manager made numerous complaints to the officials of the Virginian with reference to the defective condition of the floor of this bridge. When these complaints were made the Virginian sent men there to nail back the loose

boards, but no steps were taken to permanently remedy the defective condition of the floor.

Mr. Morgan, supervisor of bridges for the Virginian, testifies that on May 2, 1928, he himself inspected this bridge for the purpose of seeing what was needed to be done to the floor; that he found four of the boards loose, which he had to have taken up in order to replace them properly; and when they were taken up he found that the pine filler blocks under them were rotten and he had to put in new filler blocks. He further testifies that on May 9th, in response to a complaint made about the floor of this bridge, he sent a man there to nail down some loose planks.

There is evidence tending to show that the filler blocks under the floor boards between the rails of the Electric Company had become so rotten that they would not hold securely nails driven into them, and that the filler block under the particular board in question had practically rotted out from under it.

The Virginian contended, and introduced evidence tending to show, that these alterations were not properly made; that the Electric Company in making these changes used timber of unsuitable kind and size; and that the changes made in the kind and size of timbers used and in the type of construction of the floor of the bridge and its supports resulted in a faulty construction of the floor of the bridge, which was the cause of the floor boards becoming loose and of the injury to the plaintiff. On the other hand, the evidence introduced by the Electric Company tends to show that the alterations were properly made, and the type of construction and timber used by the Electric Company in making these alterations was as good as that used by the Virginian when the bridge was built. While the evidence is conflicting upon this point, there is evidence sufficient to support a finding by the jury that in making these alterations in 1926 the Electric Company made use

of an improper type of construction and improper materials which caused the floor board here in question to become loose and the injury to the plaintiff.

When the Electric Company double-tracked its line on this bridge it did not give the Virginian any notice of its intention to do so, nor did it have any agreement with or consult with the Virginian with reference to the changes which it proposed to make in the construction of this bridge. However, before the work was completed, Mr. Morgan, the bridge supervisor of the Virginian, went to this bridge to make an inspection of it and saw that the double-tracking was being done and from his personal inspection of the work knew how the double-tracking was being done, the particulars in which the construction of the bridge was being altered, and the kind of material being used by the Electric Company; and that these same facts came to the Virginian's knowledge also from subsequent repair work done on the bridge by the Virginian.

The evidence is ample to show that the Virginian Railway Company knew, or ought to have known, of the defective condition of the bridge which caused this injury and its need of repair for some time prior to May 13, 1928. While there is no direct evidence on the point, there is evidence in the record from which the jury may fairly have inferred that the Electric Company also knew, or ought to have known, of the defective condition of this bridge and its need of repair for some time prior to May 13, 1928.

The uncontradicted evidence is that the Virginian has repeatedly made repairs to this bridge and particularly to the flooring of it, including that between the rails and tracks of the Electric Company; that the bridge has always been maintained and repaired by the Virginian alone; and that up to the time of the injury here complained of the Electric Company had never, either before or after it double-tracked its line on this bridge, made any repairs

to or contributed to the maintenance of said bridge, or been called upon or requested by either the Virginian or the city of Roanoke to make any repairs thereto or to contribute to the cost of maintaining or repairing it.

The plaintiff asked for instructions Nos. 3 and 4. The court gave instruction No. 3 but refused to give instruction No. 4. The action of the court in giving instruction No. 3 constitutes the Virginian's first assignment of error. Instructions 3 and 4 are as follows:

No. 3—(*Given*): "The court instructs the jury that it was the duty of the defendant, Virginian Railway Company, in building its bridge or crossing on Thirteenth street to so construct its bridge or crossing that persons using ordinary care, traveling the road, may pass over the bridge or crossing in safety. The requirements of the law are not met by simply building a convenient road and erecting a crossing. The defendant's, Virginian Railway Company, duty is a continuing one and requires that the precautions taken shall be increased to meet the changed conditions as they may arise. And in the present case, if the jury believe from the evidence that the defendant, Virginian Railway Company, failed to perform its duty as above outlined and as the proximate cause of such failure the plaintiff was injured, then the jury must find their verdict for the plaintiff, against the Virginian Railway Company."

No. 4—(*Refused*): "The court instructs the jury that it was the duty of the defendant, the Roanoke Railway and Electric Company, to use reasonable care to keep the space between its car tracks on the Thirteenth street bridge or crossing in a safe condition to enable travelers to get on and over such crossing in safety, and in the present case, if the jury believe from the evidence that the flooring of said bridge, or a part thereof, between the car tracks of the Roanoke Railway and Electric Company, had become loosened and projected into the roadway, and further be-

lieve from the evidence that, by the exercise of reasonable care the defendant, the Roanoke Railway and Electric Company, could have prevented such flooring or parts thereof between its said car tracks from becoming loose and projecting into the street; and as the proximate cause of such failure the plaintiff was injured, then the jury must find their verdict for the plaintiff."

At the request of the Virginian the court gave instructions C and D, which are as follows:

C.—(*Given*): "The court instructs the jury that if they believe from the evidence that the Roanoke Railway and Electric Company, in the spring of 1926, constructed double-tracks over the Thirteenth street bridge without notice to the Virginian Railway Company and that in constructing said tracks over said bridge the said Street Railway Company was negligent in the manner of doing said work, or in the selection of the material used in doin said work, and that the work done by said Street Railway Company rendered the bridge in question unsafe at the time of the plaintiff's accident, when if said work had not been done by said Street Railway Company in such negligent manner the bridge would have been safe at the time of the plaintiff's accident; then the negligence of said Street Railway Company is the proximate cause of said accident and they should find the Roanoke Railway and Electric Company liable for the plaintiff's injury; and if the jury shall further believe from the evidence that the Virginian Railway Company knew or in the exercise of ordinary care should have known of the negligent manner in which said work was done in time to have remedied the defects in said work prior to the plaintiff's accident, they should also find the Virginian Railway Company liable for the plaintiff's injuries."

D—(*Given*): "The court instructs the jury that if they should find under the evidence and instructions of the court that the plaintiff is entitled to recover in this case,

and they should further find, under the evidence and instructions of the court, that the Roanoke Railway and Electric Company was negligent in the manner of doing the work of laying the double-track over the said bridge, and that such negligence caused or contributed to the accident, and that the Virginian Railway Company was negligent in not discovering and remedying the defective condition of the bridge prior to the accident caused by the negligence of the Roanoke Railway and Electric Company, then their verdict in favor of the plaintiff should be against both of said defendants."

The Electric Company objected to the giving of instructions C and D, and assigns the giving thereof as error, but in its brief withdraws the assignment of error as to both instructions C and D; and admits "that if it negligently and improperly altered the construction of the Virginian Railway Company bridge in laying its double-tracks, and as a proximate result of this negligence the plaintiff was injured, it is liable as a co-defendant" with the Virginian Railway Company for the injury of the plaintiff.

At the request of the Virginian the court, over the objection of the Electric Company, gave instruction B, which is as follows:

B.—(*Given*): "The court instructs the jury that a city or other municipality is not an insurer of the safety of persons passing along and over its streets, sidewalks and bridges, and that if the defendants, or either of them, in this case have assumed the obligation of maintaining the bridge in question, then that obligation imposes no higher duty upon the defendants or either of them than is imposed by law on a city or other municipality in respect to its streets, sidewalks and bridges.

"The jury are further instructed that the defendants or either of them are not liable for the defect between the street railway rails on the surface of the bridge in question

which, it is alleged, caused the plaintiff's injuries, unless it appears from the evidence that the defendants or either of them were negligent in repairing such defect within a reasonable time after they or it knew or should have known of such defect, and what should be considered a reasonable time under the circumstances is a question to be determined by the jury."

The giving of instruction B constitutes the first assignment of error insisted upon by the Electric Company.

We shall first dispose of the objection of the Electric Company to instruction B before considering the objections of the Virginian to instruction No. 3.

■ The Electric Company contends that instruction B is erroneous because it, in effect, tells the jury that it was the duty of the Electric Company to maintain and keep in repair that part of the floor of this bridge which lies between the rails of its tracks, when there was no such duty resting upon the Electric Company.

The point which the Electric Company makes is that, as used in those portions of said ordinances granting to it authority to construct and operate its tracks in the streets of the city of Roanoke which impose upon it the duty to maintain and repair parts of the streets occupied by its tracks (section 7 of the ordinance of 1892 and the third and fourth paragraphs of the ordinance of 1925), the word "*streets*" or "*street*" does not include within the scope of its meaning bridges.

The Electric Company insists that the language and provisions of the ordinance of 1892 make unescapable the conclusion that "streets" as used in section 7 thereof does not include within its meaning bridges, for the following reasons: (1) Specific provision for the maintenance and repair of two of the only three bridges then in the streets in which the Electric Company was thereby authorized to lay its tracks is made in section 11, which makes it

plain that it was not intended to provide under section 7 for the maintenance and repair of bridges then or thereafter constructed in these streets; (2) the language and phrase-ology of section 7 itself precludes the idea that "streets" as therein used includes bridges.

The argument of the Electric Company in support of this contention may be briefly summarized as follows:

When the original franchise of the Electric Company was granted by the ordinance of 1892, there were only three bridges in the streets in which it was authorized to construct its tracks, the Randolph street bridge, the Park street bridge, and the Development Company bridge, the last of which was a bridge over Roanoke river, which had been constructed by a private land company.

The topography was such that no additional bridges would be required in these streets unless the topography should be changed, as was done by the Virginian in making a cut across Thirteenth street at the point here involved; and "it was not contemplated at the time this franchise was granted that there would ever be other bridges in the streets over which the cars of the Electric Company would pass," and hence it is not reasonable to suppose that it was intended by this ordinance to require the Electric Company to maintain and repair any bridges that might thereafter be built in these streets.

While by section 7 the Electric Company is required to maintain and keep in repair those parts of the "streets" occupied by its tracks, by section 11 of the ordinance specific provision is made for maintaining and repairing two of the three bridges then in existence, which provision is that the Electric Company "shall pay twenty-five per cent of the cost to the city of keeping the Randolph street bridge and the Park street bridge in repair." This makes it plain that "streets" is used in contra-distinction to "bridges" and precludes any idea that the word "streets" in section 7

includes bridges within its meaning; for "if section 7 had been intended to apply to bridges, there would have been no necessity for section 11."

It is clear that both sections 7 and 11 were not intended to apply to the Randolph street and the Park street bridges. Therefore, if "streets" in section 7 be construed to include bridges, only one bridge (the Development Company bridge) would have been affected by section 7; and if it had been intended to impose upon the Electric Company any duty as to the maintenance and repair of this bridge, it is reasonable to suppose that the ordinance "would have included such a requirement in section 11, which specifically dealt with the two publicly owned bridges," and not have left it to be provided for under the general provision for the repair of "streets" in section 7.

In support of its contention that the phraseology of section 7 itself precludes the idea that it was intended to apply to bridges, the Electric Company argues thus:

The word "streets" is used four times in section 7, three times in the first sentence, and the rules of construction require that it should be given the same meaning in each place; for if "streets" be not given the same meaning in the first three instances, the same word will be given a different meaning not only in the same section and paragraph, but also in the same sentence.

The first clause of the first sentence of section 7 provides that the company "shall replace all streets, excavated, opened or torn up by it." As here used streets "could not possibly apply to bridges," it is "physically impossible for it" to apply to a bridge; for bridges are not "excavated, opened, or torn up" in constructing or repairing the tracks of a street railway thereon. Such terms are applicable only to those portions of streets the surface of which lie upon the earth as contra-distinguished from bridges.

It being thus plain that the word "streets" as used in

the first clause of the first sentence does not include bridges, it should also be construed not to include bridges where used in the second clause of the first sentence which reads: "And shall at all times keep the space between its tracks, and a space of one foot on each side of said tracks, in as good repair as the residue of said streets."

The last clause of the first sentence of section 7 provides what the Electric Company shall do "whenever the said streets shall hereafter be improved;" and the second (the last) sentence of section 7 provides that "whenever any street of the city, already improved by macadamizing or paving, is torn up by the said * * * company to lay down its tracks, * * * said macadamizing or paving shall be replaced in as good condition as before being torn up." The building of this bridge cannot be construed to be an "improvement" of a street within the meaning of the word as here used; and the language "whenever any street of the city already improved by macadamizing or paving is torn up" certainly cannot apply to a bridge, because bridges are not macadamized or paved. Therefore, streets as used the third and fourth times in section 7 must be construed not to include bridges. This further supports the contention that the word "streets" as used in the second clause of the first sentence is properly construed to mean streets exclusive of bridges.

When the Thirteenth street bridge was built, the duty of maintaining and repairing the whole bridge was placed upon the Virginian by the ordinance of 1904, and neither the city of Roanoke nor the Virginian has ever, from the time this bridge was built, 1906 or 1907, until after this action was brought in 1928, contended that it was the duty of the Electric Company to maintain and repair, or to contribute to maintaining and repairing this bridge.

Hence, concludes the Electric Company, at the time of the adoption of the ordinance of 1925 authorizing it to

double-track its line in Thirteenth street, it owed no duty to maintain or repair any portion of the floor of this bridge.

Taking up the ordinance of 1925, the Electric Company argues that while the said ordinance of 1925 did change in material respects the duties imposed upon the Electric Company by the ordinance of 1892, it imposed no duty upon it to maintain and repair any portion of this bridge for the following reasons:

(1) "In view of the fact that the duty of erecting and maintaining this bridge had previously been imposed upon the predecessor of the Virginian, and had been so maintained by it for approximately twenty years, the council of the city of Roanoke, if it had intended to in any way affect the Virginian bridge, would have said so by reference to the bridge, because it showed its knowledge of this bridge by terming it in the ordinance as the 'Virginian Railway Company Bridge.' "

(2) The ordinance authorizes the Electric Company to construct and operate double-tracks in Thirteenth street "upon the same terms and conditions as provided in the franchise heretofore granted the said company or its predecessor, the Roanoke Street Railway Company, applicable to the Electric Railway on Thirteenth street * * * except as changed and modified herein," which ordinance did not require it to maintain and repair any bridges except the Randolph street and Park street bridges.

(3) The phraseology of the fourth paragraph of the ordinance makes it clear that "streets" as therein used is not meant to include this bridge; for the provision of the ordinance is that the company "shall pay the entire cost of paving, repaving and maintaining with like material, and * * * keep in as good condition as the residue of the street, that portion occupied by such double-tracks * * *; the paving, repaving and *maintaining of such paving* to be done to the satisfaction * * * of the city

engineer;" and the language "paving, repaving, and maintaining of said paving" could only refer to Thirteenth street, exclusively of the Virginian bridge, which was paved, while there was then no paving of any kind on the bridge.

■ ■ Some of the conclusions drawn by the Electric Company do not necessarily follow from its premises, and some of these premises are faulty; its argument largely ignores the rule that in construing such ordinances the ordinance is to be construed most strongly against the company and in favor of the public, and it erroneously assumes that "streets" as used in section 7 of the ordinance of 1892 must be limited in its application to "streets" in the State in which they exist at the time of its adoption, except when specific provision is made to the contrary.

■ The specific provision made in section 11 of the ordinance of August 9, 1892, for the payment by the Electric Company of twenty-five per cent of the cost of maintaining the Randolph street and Park street bridges, takes these two bridges out of any general provision for the maintenance and repair of bridges that may be made under section 7. This would be true even if section 7 in terms required the company to repair the "streets" *and* "*bridges*" occupied by its tracks. But it does not follow that, because a special provision is made in section 11 that the Electric Company shall contribute to the upkeep of these two bridges by the city instead of repairing a portion of them, it was intended to exclude all bridges which might thereafter be constructed as integral parts of the streets occupied by the tracks of the Electric Company, or the other existing bridge, from the provisions of section 7 requiring the Electric Company to maintain and repair the portion of the streets occupied by its tracks.

■ The surface of a bridge may be said to be opened or torn up in the laying of an electric railway track as aptly as the surface of any other portion of a street may be said

to be opened or torn up. The fact that the word "excavated" is not aptly applied to work done on the surface of a bridge in laying a track thereon does not make also the expression "opened or torn up" inappropriate to express what is done to the surface of a bridge in laying a track thereon.

■ A street may be improved by placing a part of its surface on a bridge structure as well as ·in other ways. If a fill were made to improve the grade of a street it would unquestionably be an improvement in the sense the word is here used. No less would the bridgihg of a depression in the street to improve the grade of the street be an improvement of the street. Whether this particular bridge was an improvement or not is not pertinent to the point here being discussed, *i. e.*, does the word "streets" as used in the first and second clauses of the first sentence of section 7 exclude from its meaning bridges which are integral parts of those streets?

In the last sentence of section 7 the term used is not *"street"* but *"street already improved by macadamizing or paving,"* that is, that part of a street which already has been improved by macadamizing or paving. If, as sometimes is true, the part of the street carried on a bridge be macadamized or paved, there is nothing in the language of this sentence to exclude such bridge from the meaning of the word "street" as here used.

■ Bridges which carry the roadway of a street or other highway over cuts or depressions in the surface of the earth are as much integral parts of the highway or street as are those portions of it the roadway of which rests upon the earth. When· an ordinance of a city authorizes a company to construct and operate a continuous line of street railway tracks in the whole or a designated portion of a "street," it authorizes the company to construct and operate its tracks over any bridges that may then be or

may thereafter be constructed in the street, or the designated portion thereof, as integral parts of the street. Where in such ordinance it is also provided that the company shall maintain and keep in repair that portion of the street occupied by its tracks, such requirement is co-extensive with the grant, and extends to the whole occupied length of the street including such portions thereof as are then carried or may be thereafter placed on bridge structures, unless the company is in clear and explicit terms, or by necessary inference, relieved of the duty of maintaining and repairing such bridges. *United Electric Rys. Co.* v. *City of Cranston*, 46 R. I. 425, 128 Atl. 213; *Northern Central Ry. Co.* v. *United Rys. & Elec. Co.*, 105 Md. 345, 66 Atl. 444. See also, *City of Richmond* v. *Va. Ry. & P. Co.*, 120 Va. 802, 92 S. E. 898.

The language and provisions of the ordinance of 1892 do not, either in clear and explicit terms or by necessary inference, exclude from the streets which the Electric Company is thereby required to maintain and keep in repair those portions thereof carried on bridges which form an integral part of a street, as does the bridge here in question.

At the time the Virginian was authorized to make this cut and erect this bridge to carry Thirteenth street over it, the Electric Company was unquestionably required by section 7 of the ordinance of 1892 to maintain and keep in repair a portion of the surface of that part of Thirteenth street which the Virginian was authorized to remove and replace by a bridge. The city had a right to authorize such change to be made; this portion of the street was not eliminated by the placing of its surface on a bridge structure instead of on the earth; and there is nothing in the language or provisions of the ordinance of 1892 which expressly, or by necessary implication, provides that if a cut be made through a street occupied by the tracks of the Electric Company, the Electric Company shall be thereby

relieved of its existing duty to maintain and keep in repair the street at that point.

The city owed the primary duty of maintaining and keeping in repair this bridge as a part of one of its highways or streets, and had the right to take for its protection the obligation of both the Virginian and the Electric Company to perform this duty. The taking of an obligation from the Virginian to maintain and repair the whole of the bridge did not operate to exonerate the Electric Company from any duty which the Electric Company then owed or which may have been thereafter placed upon the Electric Company by the city under said ordinances of 1892 and 1925 to maintain and repair a portion of it. On the other hand, no obligation required of the Electric Company under these ordinances operated to cut down or lessen the obligation of the Virginian to the city under the ordinance of 1904.

If "streets" as used in the ordinance of 1892 includes bridges which are integral parts of the streets, as we think it does, then, upon the construction of this bridge, the Virginian and the Electric Company owed to the city independent, but concurrent, duties to maintain and keep it in repair; the Virginian to the extent of maintaining and repairing the whole bridge, the Electric Company to the limited extent provided in the ordinance granting it authority to lay its tracks in the streets. The obligation of the Virginian to the city was not constricted by the obligation of the Electric Company to the city, nor the obligation of the Electric Company to the city cancelled or released by the obligation of the Virginian. *Northern Central Ry. Co.* v. *United Rys. & Elec. Co.*, 105 Md. 345, 66 Atl. 444; *Lowell* v. *Proprietors of Locks & Canals*, 104 Mass. 18; *Proprietors of Locks & Canals* v. *Lowell Horse Railroad Corp.*, 109 Mass. 221.

*Northern Central Ry. Co.* v. *United Rys. and Elec. Co., supra,* was an action brought by the Northern Central

Railway Company to recover from United Railways and Electric Company a portion of the sum expended by the Northern Central in making repairs after March 1903 to two bridges in the city of Baltimore, one of which carries Charles street over the tracks of the Northern Central, and the other of which carries Maryland avenue over the tracks of the Northern Central.

In 1859 the Baltimore City Passenger Railway Company, a predecessor of United Railways and Electric Company, was granted the right to lay a double-track street railway in Charles street by an ordinance which provided "that the owners  *  *  *  of said railways shall keep the streets covered by said tracks and extending for two feet on the outer limits of either side of said tracks in thorough repair at their own expense." In 1868 the city of Baltimore raised the grade of Charles street so as to permit the tracks of the Northern Central to pass under it below grade at a point then occupied by said street railway tracks, the street being carried over the tracks on a bridge; and by the ordinance authorizing this change in grade, the Northern Central was obligated to the city to keep in repair this bridge.

In 1880 the Baltimore Union Passenger Railway Company, another of the predecessors of United Railways and Electric Company, was by ordinance granted the right to construct a double-track street railway line "upon Maryland avenue from Biddle street to the northern line of the city." This portion of Maryland avenue includes the portion thereof which was then carried over the tracks of the Northern Central by a bridge. In 1890 the city authorized the Northern Central to increase the number of its tracks passing under this bridge which the city had constructed to carry Maryland avenue over said tracks, and to increase the length of the bridge in order to do so, the ordinance provided that "the bridge over the tracks of the railway company as well as that now existing, as the extension thereof hereby

authorized, shall always be maintained at the sole cost of the Northern Central Railway Company."

The court held that the said bridges were parts of Charles street and Maryland avenue, respectively, within the meaning of the ordinances authorizing the predecessors of the United Railways and Electric Company to construct their tracks in these streets; that "both the railroad company and the (street) railway company are liable to the city for the repair of said bridges, the former to the extent of all the necessary repair, and the latter to the limited extent provided in the grant of authority to lay its said tracks;" but that the Northern Central was entitled to recover from the United Railways and Electric Company for the cost of the labor and material furnished by the Northern Central in repairing that portion of these bridges occupied by their tracks and for two feet on either side thereof.

The Electric Company, however, contends that the meaning of the word "streets" as used in the ordinance of 1892 is at least ambiguous; that the city of Roanoke and the Electric Company have always construed this ordinance not to require the Electric Company to maintain or repair any portion of the bridge here in question, in which construction the Virginian has acquiesced; and that this practical construction placed upon the ordinance by the city and the Electric Company should be adopted by the court; and the word "streets" be held not to include bridges and the Electric Company to owe no duty to maintain this bridge.

The Electric Company in its argument in support of this contention seems to invoke, without clearly distinguishing between them, two rules of construction, the one applicable to the construction of a contract between two parties, the other applicable to the construction of a statute or ordinance.

First it asserts that this ordinance when accepted by the Electric Company became a contract between the city and

the Electric Company; that the parties to this contract have placed a practical construction thereon to the effect that "streets" as used in the portions thereof imposing an obligation on the Electric Company to maintain and repair streets occupied by its tracks does not include bridges; and that this practical construction of the parties is now controlling of its meaning.

In the same breath it contends that the executive and administrative officers of the city of Roanoke charged with the duty of administering these ordinances have uniformly placed upon these ordinances the construction that "streets" as used in said clauses thereof do not include bridges; and that this practical construction placed thereon by these executive and administrative officers should now be adopted as the true construction.

Neither of these positions is well taken.

The facts relied upon by the Electric Company to establish that a practical construction has been placed upon "streets" as used in these ordinances by the city and the Electric Company, and by the executive and administrative officers of the city, and that this construction is that "streets" do not include bridges which are integral parts thereof, are as follows:

From the time this bridge was built, 1906 or 1907, the city of Roanoke has never requested or required the Electric Company to make any repairs to it or to contribute to the cost of maintaining or repairing it. The Electric Company has never made any repairs thereto or contributed to its maintenance or repair. The city has always made its complaints with reference to the condition of this bridge and requests that repairs be made thereon to the Virginian, even when the trouble was with the flooring between the rails of the Electric Company. The Virginian, for approximately twenty-two years, has from time to time made repairs to the bridge, including repairs to that part of the

floor between the rails of the Electric Company, and in 1927, after the Electric Company's double-track had been laid, the Virginian redecked the eastern side of this bridge outside the rails of the Electric Company and replaced some of the flooring between the rails of the Electric Company; but up to the time this action was brought the Virginian had never requested the Electric Company to maintain or repair any part of the bridge or to contribute to the cost of maintaining and repairing it, or suggested to the Electric Company that it was its duty to do so.

These facts do not show, nor is there any evidence in the record to show, that the question as to whether "streets" includes bridges has ever been raised by or with the city or its executive or administrative officers or the Electric Company prior to the time this action was brought; or that the city or its executive or administrative officers have ever done any act which was inconsistent with a construction that "streets" as used in these ordinances includes bridges, or with a construction that the Electric Company owed to the city the duty to keep the flooring of this bridge between its rails in good condition and repair.

Assuming that the word "streets" or "street" as used in the ordinances of 1892 and 1925 includes bridges, the city has exacted independent, though concurrent, obligations from both the Virginian and the Electric Company to maintain and repair this bridge; and had the right to require either or both of these companies to perform its full obligation to the city and to maintain and repair the flooring of this bridge between the rails of the Electric Company. The fact that the city has exacted of the Virginian its obligation to maintain and keep in repair this whole bridge, does not release the Electric Company from the obligation the city had exacted of it to keep the flooring between its rails in good condition and repair, or estop the city from enforcing such obligation. Nor does the fact

that the city and its executive and administrative officers have heretofore required performance in full of the duty owed to the city by the Virginian, and has not heretofore called upon the Electric Company to perform its independent, though concurrent, duty, release the Electric Company from its duty, nor is it tantamount to a construction that "streets" does not include bridges, or that the Electric Company owes no duty to the city to maintain and repair any part of this bridge.

In order to establish a practical construction of a contract by the parties thereto by acts of the parties, the acts must have been done in pursuance of and by reason of the contract. *Reed* v. *Inhabitants of City of Trenton*, 80 N. J. Eq. 503, 85 Atl. 270; *Kane* v. *Insurance Co.*, 199 Pa. 205, 48 Atl. 989; *Sternbergh* v. *Brook*, 225 Pa. 279, 74 Atl. 166, 24 L. R. A. (N. S.) 1078, 133 Am. St. Rep. 877; *Niagara Falls Int. B. Co.* v. *Grand T. R. Co.*, 212 App. Div. 705, 209 N. Y. S. 79. The acts shown here were done in pursuance of and by reason of the city's contract rights against the Virginian under the ordinance of 1904, and not in pursuance of or by reason of the contracts between the city and the Electric Company under the ordinances of 1892 and 1925. As to the contracts between the city and the Electric Company the evidence merely shows non-action upon the part of the city and its executive and administrative officers so far as this bridge is concerned; which non-action is entirely consistent with the existence of a concurrent duty upon the Electric Company to repair a portion of this bridge.

In order to establish a claimed practical construction of a statute or ordinance by the executive and administrative officers charged with its execution and administration when the ordinance is susceptible of another construction, the acts done, or the omission to act by these officers, must be inconsistent with the other construction

of which the statute or ordinance is susceptible. Where non-action is not inconsistent with the existence of a duty or obligation under an ordinance, it is not to be treated as a construction by the executive or administrative officers of the city that such duty does not exist. See in this connection *Commonwealth* v. *Kentucky Dist. & Warehouse Co.*, 143 Ky. 314, 136 S. W. 1032, and *Reed* v. *Inhabitants of Trenton, supra.*

What construction may have been placed upon the ordinances authorizing the Electric Company to construct its track in Thirteenth street is not pertinent to an inquiry as to the duty owed by the Electric Company to the city, and to this plaintiff, under these ordinances to maintain and repair this bridge. The Virginian is not a party to the contract existing between the city and the Electric Company by virtue of these ordinances, nor can it in any way be deemed to be an executive or administrative officer of the city charged with the execution and administration of these ordinances.

A proper construction of the ordinance of 1892 imposed upon the Electric Company the duty to keep in good condition the flooring of this bridge between its rails or tracks and for one foot on each side thereof. The ordinance of 1925 granted the Electric Company the right to double-track its line across this bridge "upon the same terms and conditions as provided in the franchise heretofore granted * * * applicable to the electric railway on Thirteenth street * * * except as changed or modified herein;" and the language and phraseology of the ordinance of 1925 is not such as to either expressly or impliedly modify or change the duty of the Electric Company in this respect, except to increase the part of the floor of the bridge which the Electric Company is required to keep in repair.

In 1906 the city council adopted section 563 of the general ordinances of the city of Roanoke (approved D

cember 15, 1906), hereinbefore quoted, which has since remained in effect. By this general ordinance every company which shall thereafter occupy with a double track *"the public highways or any part thereof"* is required to keep in repair the entire space between the rails of each track and between the two tracks, and the space of eighteen inches on the outside of the two outer rails.. At the time this ordinance was passed the construction of the bridge here in question had been authorized, if indeed it had not then been constructed.

█ █ It would seem plain that the language "public highways or any part thereof" as used in said section 563 includes bridges which are integral parts of these highways; and it is not to be presumed that the city council intended to repeal the provisions of the ordinance of 1906 by the provisions of the ordinance of 1925.

█ The court did not commit prejudicial error in giving instruction B. Independent, though concurrent, duties were owed by the Virginian and the Electric Company to keep in good condition the flooring of this bridge between the rails and tracks of the Electric Company; and the court should have so instructed the jury.

█ After the court had intimated what instructions it would give the jury the Electric Company moved the court to reopen the taking of evidence and permit it to introduce Mr. Hunter, the city manager of Roanoke, "to show that the understanding with the street car company as to the Thirteenth street bridge is that the street car company is under no obligation now or hereafter to keep in repair the surface of the bridge."

It is evident, we think, from the record that Mr. Hunter had already testified as to the facts which it is claimed showed such construction; and there was no error in refusing to permit him to be recalled to state his conclusion from these facts that they constituted an interpretation of the meaning of the ordinance.

■ The Virginian admits that where one company alone is responsible for the maintenance and repair of a bridge on a highway its duties in respect to the maintenance and repair of the bridge are correctly set forth in instruction No. 3; but it contends that instruction No. 3 is erroneous for two reasons:

(1) The instruction tells the jury that the Virginian owed a duty to maintain and keep in repair this bridge; but it fails to tell the jury that the Electric Company also owed the duty, concurrent with that of the Virginian, to maintain and keep in repair the flooring of this bridge between the outer rails of its double track.

(2) Instruction No. 3 is inconsistent with instruction C, and ignores the Virginian's theory of the case set forth in instruction C, which, in effect, tells the jury that if they believe from the evidence that the faulty type of construction and improper materials used by the Electric Company in laying its double-tracks in 1926 were the cause of the defective condition of the floor of this bridge which caused the injury, then the Virginian could be held responsible for this injury only if the Virginian knew or in the exercise of ordinary care should have known of the negligent manner in which said work had been done in time to remedy the defects in said work prior to the plaintiff's injury.

The court did not err in giving instruction No. 3.

Instructions No. 3 and B must be read together. When so read together, while they do not give the jury that clear and plain statement of the law of the case to which the jury is entitled in the performance of its arduous duties, yet they do in effect tell the jury that both the Virginian and the Electric Company owed the duty to keep in repair the flooring of this bridge between the rails and tracks of the Electric Company and that if both of them failed to perform this duty, then both are liable.

Instruction No. 3 is not in conflict or inconsistent with instruction C. The Virginian owed the duty to the city and to this plaintiff of keeping this whole bridge (including the flooring between the rails of the Electric Company) in good condition and repair. The question whether the repairs were made necessary by wear and tear or by an improper type of construction and material used by the Electric Company in double-tracking its line is not material in this case. From whichever cause the need for repairs arose, the duty of the Virginian was the same. Instructions No. 2 and B cover the whole field of repairs. Instruction C covers only a part of the field, those repairs made necessary by the acts of the Electric Company.

As the duty of the Virginian to the city and this plaintiff was the same whether the repairs were made necessary by wear and tear or by the acts of the Electric Company mentioned in instruction C, it would have been better had the court not given instruction C, but of this the Virginian cannot complain. While instruction No. 3 omitted to tell the jury that the Virginian was not liable unless it knew, or in the exercise of ordinary care should have known, of the need for repairs in time to have had the repairs made prior to the plaintiff's injury, this is cured by the court having so told them in instruction B.

The Virginian also assigns as error the refusal of the court to set aside the verdict because excessive. We find no error in this action of the court.

The Electric Company offered five instructions, all predicated upon the theory that the Electric Company owed no duty to maintain and repair this bridge; and could be here held liable only in case the alterations made by it in double tracking its line were improperly or negligently made. The court's refusal to give these instructions is assigned as error. From what has already been said the court did not err in refusing these instructions. Nor did the court

err either in overruling the motion of the Electric Company, made when the plaintiff rested its case, to strike out the plaintiff's evidence because there was no evidence to show any liability upon the Electric Company, or in refusing to set aside the verdict as contrary to the law and evidence. The evidence is ample to sustain the verdict against both defendants.

*Affirmed.*